JOHN J. LOGAN ET AL. v. WILLIAM A. O'NEILL ET AL.
WARREN P. JOHNSON ET AL. v. WILLIAM A. O'NEILL
ET AL.

SPEZIALE, C. J., HEALEY, PARSKEY, ARMENTANO and SHEA, JS.

Argued May 13—decision released August 3, 1982

*Theodore M. Space,* with whom were *Frederick U. Conard, Jr., Douglas S. Lavine* and, on the brief, *Robert J. Cathcart,* for the appellants (plaintiffs in each case).

*Ralph G. Elliot,* for the appellees (defendant George L. Gunther et al. in each case).

*Daniel R. Schaefer,* assistant attorney general, with whom were *Barney Lapp, Paul M. Shapiro* and *David M. Teed,* assistant attorneys general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellees (defendants in each case).

*James A. Wade,* for the appellees (defendant James J. Murphy et al. in each case).

SPEZIALE, C. J.  This appeal concerns the plan for the reapportionment of the house of representatives of the General Assembly which was adopted by the General Assembly in special session on July 31, 1981.  In these two consolidated cases the plaintiffs, who are citizens and electors of the state, have challenged the plan adopted by the General Assembly on various constitutional grounds.  The only claim of the plaintiffs which is relevant to this appeal, however, is that the plan violates the town integrity principle contained in article third, § 4 of the Connecticut constitution because the plan exces-

sively and unnecessarily divides towns in the districts for the house of representatives. The defendants are the governor, the secretary of state, the treasurer, the comptroller, the president pro tempore of the senate, the speaker of the house of representatives, and the minority leaders of both houses.

It is important to note at the outset the limited nature of the question presented by this appeal. For procedural reasons hereinafter explained, the principal issue before us is whether the plaintiffs presented sufficient evidence to the trial court to establish a prima facie case that the town integrity principle has been violated by the reapportionment plan. The question of whether the plan actually violates the town integrity principle, therefore, is *not* before us.

The decennial reapportionment of General Assembly and Congressional districts is required by article third, § 6 of the constitution, as amended by articles XII and XVI of the amendments to the constitution.[1] Pursuant to this requirement, a plan

[1] Article third, § 6 of the Connecticut constitution, as amended, provides: "a. The assembly and senatorial districts and congressional districts as now established by law shall continue until the regular session of the general assembly next after the completion of the taking of the next census of the United States. On or before the fifteenth day of February next following the year in which the decennial census of the United States is taken, the general assembly shall appoint a reapportionment committee consisting of four members of the senate, two who shall be designated by the president pro tempore of the senate and two who shall be designated by the minority leader of the senate, and four members of the house of representatives, two who shall be designated by the speaker of the house of representatives and two who shall be designated by the minority leader of the house of representatives, provided there are members of no more than two political parties in either the senate or the house of representatives. In the event that there are members of

revising the house and senate districts of the General Assembly was adopted by votes exceeding two-

more than two political parties in a house of the general assembly, all members of that house belonging to the parties other than that of the president pro tempore of the senate or the speaker of the house of representatives, as the case may be, shall select one of their number, who shall designate two members of the committee in lieu of the designation by the minority leader of that house. Such committee shall advise the general assembly on matters of apportionment. Upon the filing of a report of such committee with the clerk of the house of representatives and the clerk of the senate, the speaker of the house of representatives and the president pro tempore of the senate shall, if the general assembly is not in regular session, convene the general assembly in special session for the sole purpose of adopting a plan of districting. Upon the request of the speaker of the house of representatives and the president pro tempore of the senate, the secretary of the state shall give notice of such special session by mailing a true copy of the call of such special session, by registered or certified mail, return receipt requested, to each member of the house of representatives and of the senate at his or her address as it appears upon the records of said secretary not less than ten nor more than fifteen days prior to the date of convening of such special session or by causing a true copy of the call to be delivered to each member by a sheriff, deputy sheriff, constable, state policeman or indifferent person at least twenty-four hours prior to the time of convening of such special session. Such general assembly shall, upon roll call, by a yea vote of at least two-thirds of the membership of each house, adopt such plan of districting as is necessary to preserve a proper apportionment of representation in accordance with the principles recited in this article. Thereafter the general assembly shall decennially at its next regular session or special session called for the purpose of adopting a plan of districting following the completion of the taking of the census of the United States, upon roll call, by a yea vote of at least two-thirds of the membership of each house, adopt such plan of districting as is necessary in accordance with the provisions of this article.

"b. If the general assembly fails to adopt a plan of districting by the first day of the August next following the year in which the decennial census of the United States is taken, the governor shall forthwith appoint a commission designated by the president pro tempore of the senate, the speaker of the house of representatives, the minority leader of the senate and the minority leader of the house of representatives, each of whom shall designate two members of the commission, provided that there are members of no more than two political parties in either the senate or the house of representatives. In the event that there are members of more than two

thirds of the membership of each house.[2]  The dispute in this case concerns that part of the plan which establishes the revised districts for the house of representatives.

political parties in a house of the general assembly, all members of that house belonging to the parties other than that of the president pro tempore of the senate or the speaker of the house of representatives, as the case may be, shall select one of their number, who shall designate two members of the commission in lieu of the designation by the minority leader of that house.  The eight members of the commission so designated shall within thirty days select an elector of the state as a ninth member.

"c.  The commission shall proceed to consider the alteration of districts in accordance with the principles recited in this article and it shall submit a plan of districting to the secretary of the state by the thirtieth day of the October next succeeding the appointment of its members.  No plan shall be submitted to the secretary unless it is certified by at least five members of the commisssion.  Upon receiving such plan the secretary shall publish the same forthwith, and, upon publication, such plan of districting shall have the full force of law.  If the commission shall fail to submit such a plan by the Thirtieth day of October, the secretary of the state shall forthwith so notify the chief justice of the supreme court.

"d.  Original jurisdiction is vested in the supreme court to be exercised on the petition of any registered voter whereby said court may compel the commission, by mandamus or otherwise, to perform its duty or to correct any error made in its plan of districting, or said court may take such other action to effectuate the purposes of this article, including the establishing of a plan of districting if the commission fails to file its plan of districting by the thirtieth day of October as said court may deem appropriate.  Any such petition shall be filed within thirty days of the date specified for any duty or within thirty days after the filing of a plan of districting.  The supreme court shall render its decision not later than forty-five days following the filing of such petition or shall file its plan with the secretary of the state not later than the fifteenth day of January next following the time for submission of a plan of districting by the commission.  Upon receiving such plan the secretary shall publish the same forthwith, and, upon publication, such plan of districting shall have the full force of law."

[2] The plan which was adopted by the General Assembly on July 31, 1981, provided revisions only of the house and senate districts of the General Assembly.  Thus, the revision of Congressional districts was not included in the plan, which was adopted on the last permissible day for action by the General Assembly.  Pursuant to

In revising the districts for the Connecticut house of representatives, the General Assembly is constrained by certain constitutional principles. For example, article third, § 4 of the constitution contains a contiguity principle which requires that each house district "be contiguous as to territory . . . ."

Underlying the present dispute is the need to harmonize two conflicting constitutional principles. Article third, § 4 of the constitution[3] requires, inter alia, that "[f]or the purpose of forming assembly districts no town shall be divided except for the purpose of forming assembly districts wholly within the town." This requirement has been termed the "town integrity principle." See *Miller* v. *Schaffer*, 164 Conn. 8, 17, 320 A.2d 1 (1972). Article third, § 5, as amended, however, conflicts with the town integrity principle because it requires that "[t]he establishment . . . of districts in the general assembly shall be consistent with federal constitutional standards," namely, the federal equal population

article third, § 6 (b) of the Connecticut constitution, as amended; see footnote 1, supra; the governor appointed a commission to submit a plan for Congressional redistricting. The propriety of this bifurcation of the reapportionment plan was before the trial court in the complaint in each case. Although the trial court reserved decision on those counts at the time it dismissed the other counts in the complaints, the court subsequently dismissed those counts as well. That part of the judgment is not at issue in this appeal.

[3] Article third, § 4 of the Connecticut constitution, as amended by articles II and XV of the amendments to the constitution, provides: "The house of representatives shall consist of not less than one hundred twenty-five and not more than two hundred twenty-five members, each of whom shall have attained the age of eighteen years and be an elector residing in the assembly district from which he is elected. Each assembly district shall be contiguous as to territory and shall elect no more than one representative. For the purpose of forming assembly districts no town shall be divided except for the purpose of forming assembly districts wholly within the town."

principle. *Miller* v. *Schaffer,* supra, 17.[4] As a practical matter, the federal one-person, one-vote principle; see *Reynolds* v. *Sims,* 377 U.S. 533, 577, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); makes it impossible for a reapportionment plan to comply fully with the town integrity principle. See *Miller* v. *Schaffer,* supra, 24. Except to the extent to which the town integrity principle must be infringed upon because of the federal equal population requirement, however, the town integrity principle remains a significant constraint on the General Assembly's revision of house districts. *Miller* v. *Schaffer,* supra, 24–25. "Effect must be given to every part of and each word in our constitution . . . ." *Cahill* v. *Leopold,* 141 Conn. 1, 21, 103 A.2d 818 (1954). It is upon this continued viability of the town integrity principle that the plaintiffs base their challenge to the reapportionment plan.

In the trial court, the plaintiffs contended that the plan adopted by the General Assembly is unconstitutional as violative of the town integrity principle because the plan divides more towns than necessary to meet the federal requirements. After the plaintiffs presented their case to the trial court, the court granted the defendants' motion to dismiss under Practice Book § 302[5] because the plaintiffs

---

[4] This requirement was adopted as part of the 1965 constitution in the wake of the establishment of the one-person, one-vote principle and its application to the Connecticut legislature. See *Reynolds* v. *Sims,* 377 U.S. 533, 577, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); *Butterworth* v. *Dempsey,* 229 F. Sup. 754 (D. Conn.), aff'd sub nom. *Pinney* v. *Butterworth,* 378 U.S. 564, 84 S. Ct. 1918, 12 L. Ed. 2d 1037 (1964). Prior to the 1965 constitution, representation in the house of representatives was apportioned on a town unit basis. See *Butterworth* v. *Dempsey,* supra, 760.

[5] "[Practice Book] Sec. 302. DISMISSAL IN COURT CASES FOR FAILURE TO MAKE OUT A PRIMA FACIE CASE If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has

"failed to make a prima facie showing that . . ." the reapportionment plan "does not consider the provisions of town integrity in the state constitution . . . ."[6] From the judgment rendered, the plaintiffs have appealed to this court.

A motion for judgment of dismissal under § 302 of the Practice Book has taken the place of the former motion for nonsuit for failure to make out a prima facie case. *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 547–48, 447 A.2d 406 (1982); *Hinchliffe* v. *American Motors Corporation*, 184 Conn. 607, 609, 440 A.2d 810 (1981). The question on appeal from the granting of such a motion is whether the plaintiff has provided sufficient evidence to make out a prima facie case. Ibid. "Such a disposition of a case may be resorted to only when a plaintiff has failed to make out a prima facie case, that is, when the evidence produced by the plaintiff, if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff." *Minicozzi* v. *Atlantic Refining Co.*, 143

produced his evidence and rested his cause, the defendant may move for judgment of dismissal, and the court may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made."

[6] The trial court also dismissed the other counts in the plaintiffs' complaints. Those counts alleged, inter alia, that the reapportionment plan was unconstitutional because it had a built-in bias in favor of the incumbents of the two major parties, it violated the rights of unaffiliated voters and members of parties not represented in the General Assembly, the procedure employed by the General Assembly in reaching the plan was not in conformance with the procedure required by the constitution, the General Assembly was not provided with sufficient information on which to evaluate the plan, and the plan improperly bifurcated the redistricting of General Assembly and Congressional districts. The dismissal of those counts is not before us in this appeal.

Conn. 226, 230, 120 A.2d 924 (1956). "The evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to him [or her], and every reasonable inference is to be drawn in his [or her] favor. *Ace-High Dresses, Inc.* v. *J. C. Trucking Co.*, 122 Conn. 578, 579, 191 A. 536 (1937). A party has the same right to submit a weak case as he [or she] has to submit a strong one. *Fritz* v. *Gaudet*, 101 Conn. 52, 53, 124 A. 841 (1924). See *Lukas* v. *New Haven*, [184 Conn. 205] 210–11 [439 A.2d 945 (1981)]; *Crowell* v. *Palmer*, 134 Conn. 502, 505, 58 A.2d 729 (1948); Maltbie, Conn. App. Proc. §§ 215 and 217; Stephenson, Conn. Civ. Proc. (2d Ed.) § 192f." *Hinchliffe* v. *American Motors Corporation*, supra, 609–10.

Therefore, as previously noted, the limited question before us is whether the trial court erred in concluding that the evidence presented by the plaintiff did not make out a prima facie case.

In evaluating whether the plaintiffs' evidence makes out a prima facie case, it is appropriate to note initially the burden of proof which the plaintiffs have undertaken by challenging the constitutionality of the reapportionment plan. Although, here, the legislative action being challenged is not a statute and thus is not subject to the approval of the governor, it is entitled to at least the same judicial respect as a statute. "The burden on one attacking the constitutionality of a statute is great. There is a presumption of constitutionality which attaches to a statutory enactment; the burden which rests upon a party asserting its invalidity is to establish that it is unconstitutional beyond a reasonable doubt. *Society for Savings* v. *Chestnut Estates, Inc.*, 176 Conn. 563, 569, 409 A.2d 1020 (1979); *Engle* v. *Personnel Appeal Board*, 175

Conn. 127, 134, 394 A.2d 731 (1978); *State* v. *Warren,* 169 Conn. 207, 217, 363 A.2d 91 (1975); *Wilson* v. *Connecticut Product Development Corporation,* 167 Conn. 111, 114, 355 A.2d 72 (1974); *Kellems* v. *Brown,* [163 Conn. 478, 486, 313 A.2d 53, appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973)]." *United Illuminating Co.* v. *New Haven,* 179 Conn. 627, 641–42, 427 A.2d 830 (1980). The plaintiffs acknowledge this burden and maintain that their evidence met the burden at least to the extent of making out a prima facie case.

The 1980 census data indicates that the total population of Connecticut is 3,107,576. Under the plan adopted by the General Assembly, the number of districts for the house of representatives is 151.[7] Therefore, the ideal or perfect number of people in each district is 20,580. The plan as adopted has a maximum plus deviation of 4.42 percent and a maximum minus deviation of 3.94 percent, making the total maximum deviation 8.36 percent.[8]

The plan adopted by the General Assembly cuts the boundary lines of fifty-four towns.[9] Thirty-four

[7] Under article third, § 4 of the Connecticut constitution, as amended; see footnote 3, supra; the number of house districts may vary between 125 and 225.

[8] We note that this population deviation is somewhat larger than but still close to the 7.83 percent maximum deviation in the 1971 reapportionment which was approved by the United States Supreme Court. See *Gaffney* v. *Cummings,* 412 U.S. 735, 93 S. Ct. 2321, 37 L. Ed. 2d 298 (1973), overruling *Cummings* v. *Meskill,* 341 F. Sup. 139 (D. Conn. 1972).

[9] We note that there is some uncertainty as to whether the number of towns cut is fifty-four or fifty-five. This uncertainty arises from some confusion regarding the census treatment of thirteen individuals living on an island near Stamford and Greenwich. The plaintiffs acknowledge that the variation involved, however, is so small that it does not affect the merits of their claim in any way. We have decided, therefore, as a matter of convenience, simply to use the lower figure of fifty-four.

towns are cut more than once. If a segment of a town is defined as a part of a town in an assembly district not wholly within that town; see *Miller* v. *Schaffer,* supra, 23; the plan creates ninety-three segments of towns in the formation of 151 assembly districts.[10]

As proof that the reapportionment plan violates the town integrity principle, the plaintiffs presented the testimony of an expert witness with expertise in mathematics, statistics, and computer science[11] and introduced various alternative "plans"[12] which were drafted by the plaintiffs' expert. These "plans," each of which resulted in fewer town segments than the adopted plan, included a "plan" for a house of 151 seats (designated as CT 151), three "plans" for a house of 125 seats (CT 125, CT 125-1A, and CT 125X), a "plan" for a house of 144 seats

---

[10] By way of comparison, we note that under the 1971 reapportionment plan, which was approved by this court; see *Miller* v. *Schaffer,* 164 Conn. 8, 320 A.2d 1 (1972); the boundary lines of forty-seven towns were cut, twenty-nine towns were cut more than once, and there were seventy-eight segments overall. Id., 23.

[11] The expert witness was ruled qualified to testify as to the harmonization of the one-person, one-vote principle and the town integrity principle. The basis of this testimony was the witness' application of mathematical and geometrical principles to the drafting of reapportionment plans. The witness expressly disavowed any expertise in political matters.

[12] The plaintiffs acknowledge that their alternative "plans" are not actually complete reapportionment plans which could be implemented. Instead, these "plans" are schematic representations of plans which could be devised. A completed plan ready for implementation would have to indicate precisely the boundaries of each district, as the adopted plan does by specifying the census blocks in each district. The plaintiffs' "plans" merely indicate the total population in each district and from which town or towns that population is to come, but does not actually draw a boundary line for the district. As a consequence, the population figures for each district of such "plans" are only an approximation as the actual population would depend on where, as a practical matter, the boundary of the district could be drawn.

(CT 144), two "plans" for a house of 180 seats (CT 180 and CT 180X), and a "plan" for a house of 225 seats (CT 225). A summary of these "plans" in comparison with the 1971 reapportionment plan and the challenged plan is presented in the appendix.

The plaintiffs contend that their "plans" demonstrate the violation of the town integrity principle by the adopted plan because their "plans" show that fewer towns could have been cut: (1) if a house of 125 districts rather than 151 had been adopted; (2) if a maximum population deviation greater than 8.36 percent had been adopted; and (3) by a better "plan" within the constraints of 151 seats and 8.36 percent maximum population deviation. These contentions will be considered in turn.

### NUMBER OF HOUSE DISTRICTS

The plaintiffs contend that their "plans" CT 125 and CT 125-1A (see appendix) demonstrate a violation of the town integrity principle because the adopted plan does not employ the number of house districts, in this case 125, which minimizes the number of town cuts. As previously noted, under article third, § 4 of the constitution, the house of representatives may vary from 125 to 225 districts.[13] In the reapportionment plan of 1971, the plaintiffs point out, "[t]he choice of . . . reducing the house from 177 to 151 seats was made deliberately because the resulting electoral district population figures best fit the equal population principle and cut the fewest town lines." *Miller* v. *Schaffer,* supra, 16. There is no claim that a house of 151 districts was retained in the plan now under

---

[13] See footnotes 3 and 7, supra.

challenge for the same reason.[14] In fact, the legislative history of the adoption of the current plan indicates that 151 districts were used because that number was "workable"; 24 H. R. Proc., Pt. 29, 1981 Spec. Sess., p. 9722 (remarks of Rep. Antonina B. Parker); and had "a proven track record on which to base judgments." Report of the 1981 Reapportionment Committee.

The plaintiffs' contention, in effect, amounts to a claim that the town integrity principle requires the General Assembly to adopt the number of districts of the house of representatives which most effectively minimizes the cutting of town lines. Such a claim, however, is incorrect because it is based on a misunderstanding as to what it is in any reapportionment plan which requires that town lines be cut. It is not the number of house districts in a reapportionment plan which requires the cutting of town lines, it is the federal one-person, one-vote principle that mandates equality of population to the extent practicable. The number of house districts determines only the ideal population for each district. Although the difference in the number of house districts results in different numbers of town cuts, it is the federal requirement that causes the cutting of town lines.

The General Assembly, therefore, is not required by the town integrity principle to adopt any particular number of districts for the house of repre-

[14] The plaintiffs' expert testified that plans using a house consisting of 125 to 128 districts provided for the least number of town cuts. He also testified, however, that with the exception of a house in the 125 to 128 range, a house of 151 (together with 156 and 157) provided the next lowest number of town cuts.

sentatives.[15] Of course, the effect of the number of house districts on the number of towns cut is a factor which the legislature can and has in the past taken into account in developing its reapportionment plan. See *Miller* v. *Schaffer, supra,* 16. But it is not the only or controlling factor. Ultimately, the number of districts of the house of representatives is a judgment which our constitution entrusts to the two-thirds vote of each house of the General Assembly under article third, §§ 4 and 6, of the constitution, as amended.[16]

## POPULATION DEVIATION

The plaintiffs contend that they have shown a violation of the town integrity principle because the adopted plan does not use a higher maximum population deviation which would result in a reduction in the number of towns cut. In particular, the plaintiffs point to their "plans" CT 125X and CT 180X (see appendix) both of which, though with high population deviations, cut no towns.

It is undisputed that there is an inverse relationship between population deviation and town segmentation so that fewer towns are cut as population deviation increases. See *Miller* v. *Schaffer, supra,* 25. It is the plaintiffs' contention that the town integrity principle requires that the General Assembly take full advantage of the allowable maximum population deviation in order to minimize or even eliminate town segmentation. In particular, the

[15] Indeed, were there no federal one-person, one-vote requirement, the town integrity principle would not, by itself, dictate any particular number of house districts as Connecticut's 169 towns could be placed in anywhere between 125 and 225 districts without dividing any towns except for purposes of creating wholly contained districts. See footnote 4, supra.

[16] See footnotes 1 and 3, supra.

plaintiffs rely on *Mahan* v. *Howell,* 410 U.S. 315, 325–30, 93 S. Ct. 979, 35 L. Ed. 2d 320 (1973), where the court, in upholding Virginia's reapportionment plan, approved a maximum population deviation of 16.4 percent because it resulted from the state's policy of maintaining the integrity of political sub-division lines.

The plaintiffs' contention, in effect, amounts to a claim that the town integrity principle requires the General Assembly to adopt as high a maximum population deviation as possible so as to achieve the resulting decrease in town segmentation. This claim, however, is based on a misunderstanding of the nature of the federal one-person, one-vote principle and its impact on legislative districts in Connecticut.

The federal one-person, one-vote principle does not include a bright line test which would allow a determination of when the amount of deviation from equality crosses from the permissible to the impermissible. Under current law, there appears to be a two-tiered approach to the evaluation of state reapportionment plans. A plan with a maximum deviation of 10 percent or less is presumed to meet the federal equality requirement; a plan with a maximum deviation over 10 percent is presumed to violate the federal equality requirement, unless the state is able to justify it as a result of a permissible state policy. See *Connor* v. *Finch,* 431 U.S. 407, 418, 97 S. Ct. 1828, 52 L. Ed. 2d 465 (1977).

One valid reason, therefore, for the General Assembly to choose a maximum population deviation of less than 10 percent is to avoid or reduce the chances of a challenge to the adopted plan on federal grounds. The plaintiffs' "plans" which cut no towns, CT 125X and CT 180X, for example, both

involve maximum population deviations of over 60 percent. They would be highly unlikely to survive a challenge on federal grounds and, therefore, cannot be considered as serious alternatives.

There is, however, an even more important underlying reason why the town integrity principle has not been violated by the General Assembly's failure to use a maximum population deviation higher than that of the adopted plan: the point of the one-person, one-vote principle is to achieve equality in voting districts to the nearest extent practicable. See *Connor* v. *Finch,* supra, 419; *Reynolds* v. *Sims,* supra, 577. The point is not, as the plaintiffs suggest, to achieve the greatest inequality that can survive a court challenge.

Therefore, when the General Assembly adopts a certain maximum population deviation in furtherance of the federal requirement, it does not violate the town integrity principle merely because fewer town cuts would have resulted from a higher deviation. The plaintiffs have failed to demonstrate a violation of the town integrity principle by simply showing that a higher maximum population deviation would have resulted in fewer town cuts.

### The Plaintiffs' Better "Plan"

The plaintiffs' most serious contention is that their "plan" CT 151, which uses the same number of house districts as the adopted plan and has a lower maximum population deviation,[17] demon-

---

[17] The maximum population deviation of CT 151 is 7.3 percent, which is less than the 8.36 percent of the adopted plan. It should be remembered, however, that for reasons previously noted the maximum deviation of CT 151 is only an estimate. See footnote 12, supra. It is assumed for purposes of this discussion that the actual maximum deviation of CT 151, if implemented, would be less than 8.36 percent.

strates the invalidity of the adopted plan because CT 151 cuts fewer towns.

As previoulsy noted, the adopted plan cuts fifty-four towns resulting in ninety-three segments in the formation of 151 districts. The plaintiffs' CT 151, in contrast, cuts only forty towns resulting in sixty-four segments overall. The adopted plan segments nineteen towns smaller than the ideal population for a district, while CT 151 cuts only three such towns.[18]

It cannot be disputed that the plaintiffs' CT 151 is better than the adopted plan, at least from the perspective of the town integrity principle, because it cuts fewer towns. The question, therefore, is whether the showing of the hypothetical existence of such a plan, by itself, demonstrates that the adopted plan violates the town integrity principle.

In *Miller* v. *Schaffer,* supra, we held (p. 24) that "[i]nsofar as the cutting of town lines and the segmenting of towns is concerned the number of cuts or segments resulting is not per se an indication of invalidity under Connecticut constitutional provisions." This conclusion arises because, as previously established, it is impossible to meet fully the federal equal population requirements without cutting town lines. Ibid. The dispositive questions in *Miller* v. *Schaffer,* supra, 25, therefore, were whether the 1971 plan "segmented towns in order to meet the federal equal population requirement"

---

[18] By way of comparison, the 1971 reapportionment plan cut forty-seven towns, created seventy-eight segments overall, and cut fourteen sub-sized towns. *Miller* v. *Schaffer,* 164 Conn. 8, 15, 320 A.2d 1 (1972).

and whether the reapportionment authority[19] "exercised its best judgment to harmonize the town integrity principle of the Connecticut constitution with the federal constitutional standards . . . ." Because of the procedural posture in this case, these questions become: whether the mere existence of a better "plan" demonstrates that the adopted plan segmented towns for reasons other than compliance with the federal requirement and whether the existence of that "plan" demonstrates that the General Assembly failed to exercise its best judgment in harmonizing the town integrity principle with the federal requirement.

The problem with the plaintiffs' reliance on the existence of a better "plan" to demonstrate the invalidity of the adopted plan is that the purported demonstration depends upon the assumption that a plan is unconstitutional if there is a better plan.[20] This assumption is incorrect. In *Gaffney* v. *Cummings*, 412 U.S. 735, 93 S. Ct. 232, 37 L. Ed. 2d 298 (1973), the United States Supreme Court considered such an argument with respect to alternative reapportionment plans and their different maximum population deviations. The court noted that the plaintiffs in that case had submitted alternate plans with lower deviations than the adopted plan. The district court, however, did not accept these plans and appointed a master to develop another plan. In disapproving of this approach, the court

---

[19] In 1971, the reapportionment plan was not drafted by the General Assembly but rather by a reapportionment board appointed under article third, § 6 of the Connecticut constitution as then in effect. See *Miller* v. *Schaffer*, 164 Conn. 8, 12, 320 A.2d 1 (1972).

[20] We note that a similar argument was made in *Miller* v. *Schaffer*, 164 Conn. 8, 24, 320 A.2d 1 (1972), where the defendants suggested a plan wherein fewer town lines were cut and fewer segments of towns were created. That plan, however, had a greater maximum population deviation than the challenged plan.

asked: "Was the Master compelled, as a federal constitutional matter, to come up with a plan with smaller variations than were contained in [the plaintiffs'] plans? And what is to happen to the Master's plan if a resourceful mind hits upon a plan better than the Master's by a fraction of a percentage point?" Id., 750. The court answered its own question by concluding: "Involvements like this must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' . . . . The point is that such involvements should never begin." Id., 750–51.

The plaintiffs' case, which depends upon demonstrating the unconstitutionality of the adopted plan by the mere existence of their better "plan," suffers the same infirmity. Although CT 151 is better than the adopted plan in that it cuts fewer towns, it is not perfect. It creates sixty-four segments, only thirty-one of which the plaintiffs claim are inevitable. Thus, CT 151 itself creates thirty-three segments which are "avoidable."[21] Does this mean that it, too, if it were a completed plan, is unconstitutional so long as another even better plan can be drawn? We think not.

This process of comparing one plan to another, by itself, does not and cannot demonstrate a plan to be unconstitutional. The question that needs to be asked is not whether there is a plan better than the challenged plan, but whether the challenged plan is itself constitutional. The existence of a plan

---

[21] The plaintiffs' expert defined "avoidable" segments for any plan as the difference between the total number of segments and the number of segments which are mathematically inevitable for that plan. The plaintiffs' expert acknowledged, however, that as a practical matter all "avoidable" segments may not actually be avoidable.

which cuts fewer towns is evidence only that fewer towns could have been cut. It is not, by itself, evidence that towns were cut in the adopted plan for reasons other than to meet the federal equal population requirement or that the challenged plan was not the legislature's best judgment in harmonizing the conflicting constitutional requirements. In order to present a prima facie case, the plaintiffs would have had to present such evidence. This the plaintiffs did not do.

The plaintiffs have suggested that if we were to reach the decision we have, we would deprive the town integrity principle of "legal meaning." We disagree. All we have decided today is that the plaintiffs in this case failed to make out a prima facie case supporting their allegation of a violation of the town integrity principle. We do not even decide, because we are not called upon to do so, whether the adopted plan actually violates the town integrity principle. What we have decided today, however, is that anyone challenging a reapportionment plan must show more than that a better plan could be drafted. We emphasize that this decision in no way alters the fact that the town integrity principle is an operative part of our constitution and is a significant constraint on the General Assembly's reapportionment authority.

There is no error.

In this opinion the other judges concurred.

# APPENDIX

## REAPPORTIONMENT SUMMARY

| | 1971 Plan | 1981 Plan | CT 151 | CT 125 | CT 125-1A | CT 125X | CT 144 | CT 180 | CT 180X | CT 225 |
|---|---|---|---|---|---|---|---|---|---|---|
| No. of Districts | 151 | 151 | 151 | 125 | 125 | 125 | 144 | 180 | 180 | 225 |
| No. of Sub-size Towns Segmented | 14 | 19 | 3 | 2 | 2 | 0 | 1 | 1 | 0 | 1 |
| Max. Plus Deviation | 3.93 | 4.42 | 3.80 | 4.63 | 4.63 | 32.69 | 8.26 | 6.23 | 27.90 | 5.46 |
| Max. Minus Deviation | 3.90 | 3.94 | 3.50 | 4.00 | 4.44 | 27.87 | 7.97 | 6.05 | 32.34 | 5.83 |
| Max. Population Deviation | 7.83 | 8.36 | 7.30 | 8.63 | 9.07 | 60.56 | 16.23 | 12.28 | 60.24 | 11.29 |
| No. Towns Segmented | 47 | 54 | 40 | 33 | 30 | 0 | 31 | 42 | 0 | 56 |
| No. Towns Multi-Segmented | 29 | 34 | 19 | 15 | 9 | 0 | 8 | 10 | 0 | 19 |
| Total No. of Segments | 78 | 93 | 64 | 55 | 41 | 0 | 41 | 56 | 0 | 83 |
| Inevitable Segments | 31 | 31 | 31 | 23 | 22 | 0 | 27 | 37 | 0 | 45 |
| "Avoidable" Segments | 47 | 62 | 33 | 32 | 19 | 0 | 14 | 19 | 0 | 38 |
| No. of Districts with Segmented Towns | 55 | 60 | 47 | 35 | 34 | 0 | 33 | 40 | 0 | 52 |