I. David Falker, Trustee *v.* Anthony Samperi et al.
(10335)

Healey, Parskey, Shea, Grillo and Covello, Js.

---

Argued February 10—decision released June 21, 1983

*Daniel Green,* for the appellant (plaintiff).

*Louis I. Gladstone,* with whom, on the brief, was *Matthew B. Woods,* for the appellee (defendant).

ARTHUR H. HEALEY, J. The plaintiff has appealed from the trial court's judgment granting the defendants' motion for judgment of dismissal for failure to make out a prima facie case under Practice Book § 302.[1]

This action is one for damages, tried to the court, *Ford, J.,* in which the plaintiff, I. David Falker, trustee, claims that the defendants Anthony Samperi and Pasquale Puglio converted certain of his property in viola-

---

[1] Practice Book § 302 provides:

"Sec. 302. DISMISSAL IN COURT CASES FOR FAILURE TO MAKE OUT A PRIMA FACIE CASE

If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has produced his evidence and rested his cause, the defendant may move for judgment of dismissal, and the court may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made."

tion of a written agreement[2] between them. The plaintiff's amended complaint alleges essentially that the plaintiff was the title owner of certain real property on the westerly side of route 25 in Newtown which is situated immediately north of real property belonging to the defendant Samperi;[3] that Samperi, acting either directly or through his agent, the defendant Puglio, was conducting a gravel mining operation on the property owned by him; and that on November 2, 1977, the parties to the action entered into a written agreement pursuant to which the defendants entered and remained upon the plaintiff's property to grade the property pur-

---

[2] The written agreement provides:

"November 2, 1977

"An agreement regarding grading of gore at 'Samperi' and 'Falker' properties:

"An agreement has been reached between Pasquale Puglio, 31 Prospect Avenue, Trumbull, who is operating under a mining permit from the Town of Newtown issued to Anthony Samperi, 15 Meadow View Drive, Trumbull, for the property of Anthony Samperi located on Route 25 and Cold Spring Road, Newtown, and I. David Falker, Ridge Road, Newtown, Trustee for the property extending north of the boundary of Samperi property.

"1. Mr. Puglio will eliminate the gore between both properties by grading said properties with the material on the dividing gore.

"2. No work is to begin on the Falker property until and unless the Samperi site is found to be in full compliance with the Newtown Sand and Gravel Regulations.

"3. Only material on the Samperi property is to be used for grading the Samperi property and the material in the gore of the property of which I. D. Falker is Trustee is to be used solely for grading the Falker property. No material under any circumstances is to be removed from the Falker Property.

"4. All work indicated in this agreement is to be done by Mr. Puglio. All work is to be completed before the current mining permit expires.

Pasquale Puglio

Anthony Samperi

I. David Falker, Trustee"

[3] The Samperi property consists of approximately 14 acres. The Falker property, formerly owned by Leonard Capozziello, consists of approximately 38 acres.

suant to their written agreement. It is also alleged that Puglio, acting directly, and Samperi, either acting directly or through Puglio as his agent, have converted to their own use and removed from Falker's premises material which belonged to the plaintiff. The amount of material is alleged, subject to exact survey, to be in excess of 20,000 cubic yards and was supposed to be used upon the plaintiff's property in accordance with the written agreement. It is further alleged that the plaintiff's lands have depreciated in value as the result of the defendants' actions and that the plaintiff's cost of replacing the removed material will be not less than $3 per yard. The defendants deny all the allegations of the amended complaint or plead no knowledge, admitting only that Puglio conducted a gravel mining operation on the Samperi property.

Initially, we note that the trial court's finding of facts, in part, includes the following: In 1975, Samperi and Puglio orally agreed that Puglio was to remove earth materials from Samperi's property. During 1975 and subsequently Puglio did complete substantial excavations of earth materials from Samperi's property. As a result of these excavations by Puglio and excavations that had been completed on the plaintiff's property when it was controlled and owned by the plaintiff's grantor,[4] one Capozziello,[5] there remained "in the general vicinity of the land between the properties of the plaintiff and the defendant Samperi an unexcavated portion of land at a grade substantially higher than that of the excavated areas to both the north and the south

---

[4] The evidence disclosed that the plaintiff acquired title to this property by warranty deed from Leonard Capozziello in September, 1977.

[5] Our examination of the transcript of approximately one thousand pages would indicate that prior to the entry of Puglio onto the plaintiff's property after the execution of the parties' written agreement of November 2, 1977, there had been no excavating done on the plaintiff's property since he had acquired it from Capozziello.

which was generally defined and understood to be an area known as 'the gore.' " It became "obvious" to the parties that in order to excavate the area known as the gore, it would be necessary for Puglio to enter "in and upon" the plaintiff's property to complete the leveling and excavating of the gore area. Accordingly, the parties executed the written agreement pursuant to which Puglio was permitted to enter the plaintiff's property "for the purpose of leveling and excavating the gore area." Thereafter, Puglio did enter the plaintiff's property and excavated and leveled "the entire gore." It was as a result of this excavation that the plaintiff insituted this action claiming in part that the defendants removed in excess of 20,000 cubic yards of material "that was part of the gore and which was to remain on the plaintiff's property."

The trial court found that the parties were in "substantial agreement" as to the eastern, western and northern boundaries of the plaintiff's property. It further declared, however, that the "crucial disagreement concerns the southern boundary of the plaintiff's land and, conversely, the northern boundary of the defendants' land, since it is that boundary which intersects the gore." After the plaintiff presented his case, the court reserved decision[6] on the defendants' motion for a judgment of dismissal then made under Practice Book § 302. Sometime thereafter, the court filed its memorandum of decision in which it granted the defendants' motion. In its memorandum, it held that, even viewing the evidence in the light most favorable to the plaintiff, it could not "find that the plaintiff has made out a prima facie case with respect to the threshold issue of the location of the southern boundary."

---

[6] The trial of this case took place over six days and involved over fifty exhibits, some of which were excluded.

The trial court issued a lengthy memorandum of decision. It found that the deeds and probate certificates introduced by the plaintiff only established the fact that the plaintiff's southern boundary was on "land now or formerly of Samperi" with no other references to marks, monuments, courses or distances. The court found these documents were inadequate, even when considered along with the testimony of witnesses, including land surveyors and the parties themselves, and a number of maps.[7] Particular emphasis was laid by the court and the parties on the "Goodman" map made in 1954 for Capozziello. The court rejected the claim based upon the plaintiff's evidence, including that of Stuart Somers,[8] his expert, that the southerly boundary of his property was what is shown as an old barbed wire fence[9] shown on the "Goodman" map. In doing so, it rejected considerable evidence adduced to demonstrate the validity of the Goodman line in its depiction of the plaintiff's southerly boundary. Explicit in its rejection of the evidence directed to the "Goodman" map so offered was the court's view that each and every one of the numerous other topographical or photogrammetric maps were based "in whole or in large part" on the "Goodman" map in establishing the common boundary. Fairly read, its decision indicates that it found this defect in all the map evidence directed to establishing the plaintiff's southern boundary. The court noted the absence of any evidence from the plaintiff's predecessor in title or neighboring landowners as well as the plaintiff's failure to produce any testimony by the plaintiff or the defendant as to the exact location of their common boundary. It said that while Samperi

---

[7] The evidence here included surveys, topographical maps, aerial maps and photogrammetric maps.

[8] Somers was a registered professional engineer and a land surveyor.

[9] This barbed wire fence, although admittedly hardly intact in 1954, was not at all in existence in 1977.

testified that he "thought" the boundary lay ten to twelve feet north of the old barbed wire fence (shown on the "Goodman" map) such testimony was "worthless" as there was no competent evidence as to the "exact location" of the fence. William H. Laws, one of the principals with Falker in this property, also testified. He was a builder, developer and excavator in Newtown, lived close to this property and was familiar with it. The court, after examining all his testimony, concluded that it was not "able to afford it any degree of credibility." It concluded that the determination of the southerly boundary of the property of the plaintiff, in the present case, on the court's part, "would be totally the result of speculation, surmise, or guess." It then granted the defendants' motion to dismiss and this appeal followed.

On appeal, the plaintiff claims that the trial court erred: (1) in granting the defendants' motion to dismiss for failure to make out a prima facie case because he had offered significant competent evidence on every material allegation of his complaint; and (2) in excluding from evidence the offer of certain surveys showing Samperi's northerly boundary which the plaintiff claimed were admissible as admissions against Samperi's interest.

" 'A motion for judgment of dismissal has replaced the former motion for nonsuit for failure to make out a prima facie case. Compare Practice Book § 302 with Practice Book, 1963, § 278; see *Lukas* v. *New Haven,* 184 Conn. 205, 210 n.3, 439 A.2d 949 (1981). When such a motion has been granted, the question is whether sufficient facts were proved to make out a prima facie case. *Pignatario* v. *Meyers,* 100 Conn. 234, 239–40, 123 A. 263 (1924). To state it another way, a judgment of dismissal is only proper "when the evidence produced by the plaintiff, if fully believed,

would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff." *Minicozzi* v. *Atlantic Refining Co.,* 143 Conn. 226, 230, 120 A.2d 924 (1956). The evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to him, and every reasonable inference is to be drawn in his favor. *Ace-High Dresses, Inc.* v. *J. C. Trucking Co.,* 122 Conn. 578, 579, 191 A. 536 (1937). A party has the same right to submit a weak case as he has to submit a strong one. *Fritz* v. *Gaudet,* 101 Conn. 52, 53, 124 A. 841 (1924). See *Lukas* v. *New Haven,* supra, 210–11; *Crowell* v. *Palmer,* 134 Conn. 502, 505, 58 A.2d 729 (1948); Maltbie, Conn. App. Proc. §§ 215 and 217; Stephenson, Conn. Civ. Proc. (2d Ed.) § 192f.' *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 609–10, 440 A.2d 810 (1981)." *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.,* 187 Conn. 544, 547–48, 447 A.2d 406 (1982); see *Logan* v. *O'Neill,* 187 Conn. 721, 728–29, 448 A.2d 1306 (1982). Whether the plaintiff made out a prima facie case presented a question of law for the court. *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.,* supra, 561.

In examining the plaintiff's first claim of error, we initially turn to the trial court's determination that the plaintiff's action sought recovery of money damages for the conversion by the defendants of a stated amount of his land. " 'Conversion is usually defined to be an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. *Laverty* v. *Snethen,* 68 N.Y. 522 [1877]. It is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the

plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm. Pollock's Law of Torts, p. 290.' *Gilbert* v. *Walker,* 64 Conn. 390, 394, 30 A. 132 [1894]; *Bruneau* v. *W. & W. Transportation Co.,* 138 Conn. 179, 182, 82 A.2d 923. [1951]." *VanDerlip* v. *VanDerlip,* 149 Conn. 285, 288–89, 179 A.2d 619 (1962). In order to demonstrate that his land was taken as claimed in breach of the parties' written agreement, the trial court properly noted that the burden was on the plaintiff to prove the location of his southerly (or Samperi's northerly) boundary line. It reasoned that because the court could not find that the plaintiff had proven his exact boundary[10] it was thus impossible to find that the defendants had converted part of his property as claimed.

Although this trial included a number of witnesses and many exhibits, no extensive review of the evidence admitted is necessary to demonstrate that the plaintiff's evidence met the "relatively low standard"; *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 620, 440 A.2d 810 (1981); necessary to withstand the defendants' § 302 motion. For example, the defendant Samperi testified that he was "very, very familiar" with his land, it had been in his family for over fifty years and he had owned it since 1941. He said that in 1950 there was a fence separating his property from the Capozziello property, it was "an

---

[10] In discussing the plaintiff's duty to prove the location of his boundary in this case, the trial court states that "the plaintiff must rely on the strength of his own title and not the weakness of the defendant's," citing *Hurlburt* v. *Bussemey,* 101 Conn. 406, 410, 126 A. 273 (1924), an action in ejectment. We should point out that while the plaintiff must prove the location of his southerly boundary line (which is coterminous with that of Samperi's northerly boundary in the area involved), this action is not to quiet title. See, e.g., *Roberts* v. *Merwin,* 80 Conn. 347, 68 A. 377 (1907).

old broken fence," a "wire fence." [11] In 1954, one Cole Goodman, a land surveyor and architectural engineer, made a survey of the property of Capozziello, the plaintiff's predecessor in title. This map, which was admitted into evidence, through Goodman's widow,[12] as a business entry, depicted the southerly boundary of the now Falker, formerly Capozziello, property as a wire fence. It came in as a full exhibit. As such, it had the effect, at the very least for the purpose of the defendants' § 302 motion, of being direct evidence of the location of the southerly boundary in 1954. See *Banks* v. *Watrous,* 134 Conn. 592, 596, 59 A.2d 723 (1948); *Bisnovich* v. *British American Assurance Co.,* 100 Conn. 240, 245, 123 A. 339 (1924). It was probative evidence of what it depicted. See *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 319, 240 A.2d 881 (1968).

In addition, the plaintiff produced Somers who was, as we have noted, a registered professional engineer and land surveyor. This expert gave his opinion as to the amount of cubic yards of material he estimated that the defendants removed from the plaintiff's property.[13] In so doing, he gave his opinion of the location of the plaintiff's southerly boundary which led to his opinion of the materials removed. In lengthy testimony, supplemented by various documents, Somers described how he arrived at his opinion. These included, inter alia, results of 1975 and 1978 aerial contour maps, certain

[11] On examination by plaintiff's counsel the following occurred:

"Q. Was there a fence? Was there a fence separating that property from the Capozziello property?

"A. Yes, there was.

"Q. In 1950?

"A. Yes, there was an old broken fence, but it was—you could detect the fence every so often where it was—where it was, you know, hammered to the tree; where it was installed to the tree."

[12] Cole Goodman died in 1971.

[13] The plaintiff had already testified that, outside of the defendant Puglio, no one had gone onto his property to remove any materials.

maps, including the "Goodman" map, his knowledge of the excavation history of the site, examination of Newtown's land records and assessors' records, various concrete highway bounds, iron pins in the field, and work in the field. Drawing upon this data, he enlarged the "Goodman" map on a grid to the scale of certain topographical maps upon which he plotted some objects he had physically located in the field and based on those locations placed on the grid of the map he made the boundary line blown up from the "Goodman" map. Superimposition of the "Goodman" fence boundary line upon the topographical maps and a comparison of the topography of the area of the gore in 1975 and 1978 enabled Somers to form an opinion of the amount of material claimed to have been removed from the plaintiff's property. This, of course, also involved giving his opinion of the plaintiff's southerly boundary. In doing so, he was examined and cross-examined at length concerning the method and materials he utilized, the accuracy of the "Goodman"[14] map and his opinions.

---

[14] Somers' testimony included the following:

"The Witness: We arrived at the line by blowing up the Goodman map and superimposing it on here. Then we checked to see how well that line fit with the physical evidence that we have based on the 1975 topographical flight, being the top of the excavated area and the tree line, as shown on that map. And, based on that, it's my opinon that the Goodman line does, in fact, fit very well with the physical evidence that we actually are able to see in the field, that existed in 1975, that it follows along the top of the excavated area just 15 feet more or less back in from the top of the excavated area.

"If, in fact, when we blew this up, the Goodman line came out in the middle of the excavated area, we would have assumed that there was an error in the Goodman map or that Cappoziello [sic] had been excavating on somebody else's property, but to our knowledge nobody had claimed that Cappoziello [sic] had excavated on anybody else's property and the fact that the Goodman line did follow very well right around the top of that excavated area and the fact that the Goodman line did fit the survey data that we were able to check on the State Highway and that it did, in fact, check on the actual distance between the State Highway on one side and the wood road on the other side, that we felt that lacking any other data that we had

There was before the court Somers' expert testimony as to how he reached his opinion, using volumetric computations based on his testimony and certain documents, of the claimed amount of the materials removed which also included his opinion of the boundary in question. His opinion evidence went to the heart of the issue in this case. The trial court erred in not accepting this opinion evidence, as well as the remainder of the plaintiff's evidence and should have denied the defendants' motion. In a § 302 motion "we measure the plaintiffs' evidence against a relatively low standard: Whether, by taking all the evidence produced as true and considering all inferences in the plaintiffs' favor which can be drawn therefrom, the plaintiffs have sustained their burden of showing a prima facie case." *Hinchliffe* v. *American Motors Corporation,* supra, 620.

The plaintiff next claims error in the trial court's exclusion from evidence of four surveys[15] offered by the plaintiff as admissions against the defendant Samperi's interest as to the location of his northerly, and the plaintiff's southerly, boundary. The defendants' brief admits that "Fuller & Co. prepared all four surveys for submission to the Newtown Planning and Zoning Commission [commission] in connection with the Defendant's [Samperi's] application for mining permits." All four surveys were submitted to the commission by Samperi himself or on his behalf, all in connection with his applications for gravel mining permits. The plaintiff claims that in doing so, Samperi represented to the

knowledge of, that the Goodman map was the best indication of the boundary line between these two parcels. And, we then proceeded to use that line to do our volumetric computations of the material in that area."

[15] The surveys were exhibits II, PP, TT and N-4 (for identification). The first three exhibits were in evidence as exhibits but were each admitted on a limited basis. Exhibit N-4 (for identification) was offered solely as an admission by Samperi with reference to his northerly boundary and was never admitted into evidence.

commission that these maps delineated his northerly boundary. The plaintiff argues that in thus adopting this boundary in his application to the commission to procure the issuance to him of the mining, sanding and gravel permits actually issued, each represents an admission against his interest, regardless of the defendants' claims of inaccuracy. The defendants argue that the court properly excluded these topographical maps as they were "clearly inaccurate" and were never adopted by Samperi as statements of his northerly property boundary, and hence were not admissions against his interest. Included in these claims is the assertion that these maps "perpetuated the clearly erroneous boundary depicted on the Goodman map . . . ." We find error in the rulings excluding all four surveys, each of which were claimed to be admissible as admissions against interest of Samperi.[16]

The sand and gravel regulations of the town of Newtown (regulations) provide that an applicant seeking a mining permit "shall file" certain documents with the zoning enforcement officer including, inter alia, "a. A detailed statement or description of the existing premises and of the proposed work and the condition and final grades of the property after the work is completed, and a statement of the type of earth materials to be excavated . . . ." An applicant must also file: "2. A survey and such other documents or writings as may be required to carry out the purposes of these regulations (in such form as the Newtown Planning and Zoning Commission may prescribe) prepared by a licensed land surveyor and a licensed Professional Engineer, where required by State Statute, which

---

[16] The parties have referred to "admissions against . . . interest" in discussing this issue. This frame of reference we feel is inappropriate under the circumstances of this case. See McCormick, Evidence (2d Ed.) § 276. Rather, we deem the evidentiary referrant of "adoptive admissions" to be pertinent. Id., § 277.

survey shall be drawn to a scale of 1″ equals 40′ and shall describe and delineate the following . . . .''[17] They also provide that ''[n]o excavation which requires a Mining Permit shall be made . . . 2. Within fifty (50) feet of any *property* or street line . . . .'' (Emphasis added.) While the defendants' brief admits that besides being prepared by Fuller & Co. for submission to the commission in connection with Samperi's application for mining permits and that they were submitted, they argue they were submitted because of the town's concern that a landowner might ''overstrip'' his land in his ongoing mining operations and so it required submission of these topographical maps to measure his present activities as well as his future mining plans. This, they argue, was the only purpose for their submission and this was the only way in which the defendant dealt with them. The short answer to this is that they were submitted by Samperi in compliance with the regulations and his application for such a permit[18]—and he was awarded such permits.

It is in the light of these circumstances that certain principles are applicable. ''A primary use and effect of an admission is to discredit a party's claim by exhibiting his inconsistent other utterances . . . . It is their inconsistency with the party's present claim that gives them logical force.'' (Footnote omitted.) 4 Wigmore, Evidence (Chadbourn Rev.) § 1053, p. 16. Dean Wigmore also states that ''written statements of a *third person* may be so dealt with *by the party* that his assent to the correctness of the statements may be inferred, and they would thus by adoption become his own statements.'' (Emphasis in original.) Id., § 1073,

[17] The four exhibits, i.e., Ex. II, PP, TT and N-4 for identification, were all drawn to the scale of one inch equals forty feet and were prepared by a licensed land surveyor and a licensed professional engineer.

[18] For example, Samperi himself testified that he filed exhibit PP himself together with an application to the commission for a mining permit.

p. 129. Frequently, a party's use of a document made by a third person will amount to an approval of its statements as correct and, accordingly, may be received against him as an "admission by adoption." Id., § 1073 (4), p. 138; see *Courtney* v. *Courtney,* 542 P.2d 164, 166 (Alaska 1975); *LaPierre* v. *Maltais,* 119 N.H. 610, 612, 406 A.2d 123 (1979); *Oxley* v. *Linnton Plywood Assn.,* 205 Or. 78, 101–102, 284 P.2d 766 (1955); *Jones* v. *Allen,* 7 Utah 2d 79, 85, 318 P.2d 637 (1957); see also *Russo* v. *Metropolitan Life Ins. Co.,* 125 Conn. 132, 3 A.2d 844 (1939); see McCormick, Evidence (2d Ed.) § 269. This applies even to information based on hearsay as it may be assumed that the user of the writing informed himself of its contents. *Courtney* v. *Courtney,* supra; see also *Russo* v. *Metropolitan Life Ins. Co.,* supra; McCormick, supra, § 263, p. 632. The circumstances surrounding the use of such a document are significant in determining whether its use constitutes an admission by adoption. For example, in *Courtney* v. *Courtney,* supra, which involved a husband's appeal from the trial court's division of assets in a divorce case, he claimed the trial court improperly relied on a financial statement prepared by an accounting firm for him and his wife two months prior to the parties' separation in connection with an application for a bank loan. In finding an adoptive admission of the statement by the husband, the *Courtney* court opined that his claim that it was inadmissible because it was based on hearsay information would have merit "were it not for the fact that it was used by Mr. and Mrs. Courtney for the purpose of obtaining a loan." *Courtney* v. *Courtney,* supra.

In this case, Samperi's use of the surveys prepared on his behalf for the purpose referred to, under the circumstances, amount to an adoption by admission by

him on a critical issue, i.e., his northerly boundary, and should have been admitted into evidence on the ground offered.

We do note that the defendants' brief raises a question not heretofore raised in the record before us. They claim that even if the dismissal was "technically improper," such error was harmless and the judgment should, nevertheless, be affirmed because the trial court in effect ruled on the merits and granted the motion to dismiss after submission of full trial briefs to emphasize the weakness of the plaintiff's case. Accordingly, they go on to argue there should be no remand for a new trial which they assert would normally follow if reversible error were found. See *Crowell* v. *Palmer,* 134 Conn. 502, 58 A.2d 729 (1948); *Pentino* v. *Pappas,* 96 Conn. 230, 113 A. 451 (1921).

The trial court, in its memorandum of decision of July 17, 1980, stated that "the [trial] court, holding in reserve the defendant's motion for dismissal at the conclusion of the plaintiff's case, now grants the motion to dismiss." The judgment file shows that the motion to dismiss was granted. The plaintiff appealed from the "judgment of the trial court filed 7-17-80 granting defendant's motion to dismiss." We dispose of this case on the theory upon which it was presented to and decided by the trial court. *Machiz* v. *Homer Harmon, Inc.,* 146 Conn. 523, 525, 152 A.2d 629 (1959); *New Haven Trolley & Bus Employees Credit Union* v. *Hill,* 145 Conn. 332, 335, 142 A.2d 730 (1958).

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.