JOHN W. FONFARA ET AL. v. REAPPORTIONMENT COMMISSION
(14421)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, BORDEN and BERDON, Js.

Argued January 16—decision released May 26, 1992

*Wesley W. Horton,* with whom were *Alexandra Davis* and *Karen Murdoch,* for the appellants (petitioners).

*Aaron S. Bayer,* deputy assistant attorney general, with whom were *Henry S. Cohn* and *Daniel Schaeffer,* assistant attorneys general, and, on the brief, *Richard Blumenthal,* attorney general, and *Arnold B. Feigin,* assistant attorney general, for the appellee (respondent).

*Janet Bond Arterton* filed a brief for the New Haven board of aldermen as amicus curiae.

*Jorge A. Simon,* corporation counsel, *Thomas R. Cox,* assistant corporation counsel, and *Karen Buffkin,* legal intern, filed a brief for the city of Hartford as amicus curiae.

PETERS, C. J. The principal issue in this case is whether this court should overturn a plan for reapportionment of the state house of representatives without a prima facie showing that the plan manifests an improper reconciliation of the federal constitutional principle of one person, one vote, with the state constitutional principle of town integrity. The petitioners, who are citizens and electors of the state, have invoked the original jurisdiction conferred upon this court by article third, § 6 (d) of the Connecticut constitution, as amended, "to correct any error made in [the commission's] plan of districting." The petitioners allege that the plan's redistricting for the house of representatives, adopted by the Reapportionment Commission on November 29, 1991, excessively and unnecessarily divides towns so as to violate the town integrity principle contained in article third, § 4 of the Connecticut constitution. On January 23, 1992, after an oral argument on the merits of the petitioners' allegations, this court announced its judgment denying the petitioners the relief they sought, with our opinion or opinions to follow thereafter. We publish these opinions herewith.

A decennial reapportionment of General Assembly and Congressional districts is required by article third, § 6 of the constitution, as amended by articles XII, XVI, and XXVI of the amendments to the constitution.[1] Pur-

[1] Article third, § 6 of the Connecticut constitution, as amended, provides: "a. The assembly and senatorial districts and congressional districts as now established by law shall continue until the regular session of the general assembly next after the completion of the taking of the next census of the United States. On or before the fifteenth day of February next following the year in which the decennial census of the United States is taken, the general assembly shall appoint a reapportionment committee consisting

suant to this requirement, the General Assembly appointed a committee to devise a reapportionment plan in accordance with the 1990 census data. Although the committee held a number of public hearings and did a substantial amount of work, it was unable to pro-

of four members of the senate, two who shall be designated by the president pro tempore of the senate and two who shall be designated by the minority leader of the senate, and four members of the house of representatives, two who shall be designated by the speaker of the house of representatives and two who shall be designated by the minority leader of the house of representatives, provided there are members of no more than two political parties in either the senate or the house of representatives. In the event that there are members of more than two political parties in a house of the general assembly, all members of that house belonging to the parties other than that of the president pro tempore of the senate or the speaker of the house of representatives, as the case may be, shall select one of their number, who shall designate two members of the committee in lieu of the designation by the minority leader of that house. Such committee shall advise the general assembly on matters of apportionment. Upon the filing of a report of such committee with the clerk of the house of representatives and the clerk of the senate, the speaker of the house of representatives and the president pro tempore of the senate shall, if the general assembly is not in regular session, convene the general assembly in special session for the sole purpose of adopting a plan of districting. Upon the request of the speaker of the house of representatives and the president pro tempore of the senate, the secretary of the state shall give notice of such special session by mailing a true copy of the call of such special session, by registered or certified mail, return receipt requested, to each member of the house of representatives and of the senate at his or her address as it appears upon the records of said secretary not less than ten nor more than fifteen days prior to the date of convening of such special session or by causing a true copy of the call to be delivered to each member by a sheriff, deputy sheriff, constable, state policeman or indifferent person at least twenty-four hours prior to the time of convening of such special session. Such general assembly shall, upon roll call, by a yea vote of at least two-thirds of the membership of each house, adopt such plan of districting as is necessary to preserve a proper apportionment of representation in accordance with the principles recited in this article. Thereafter the general assembly shall decennially at its next regular session or special session called for the purpose of adopting a plan of districting following the completion of the taking of the census of the United States, upon roll call, by a yea vote of at least two-thirds of the membership of each house, adopt such plan of districting as is necessary in accordance with the provisions of this article.

"b. If the general assembly fails to adopt a plan of districting by the fifteenth day of the September next following the year in which the decen-

duce a final plan before its deadline of September 15, 1991. Therefore, pursuant to article third, § 6, as amended, it was superseded by a Reapportionment Commission. Seven members of the eight member General Assembly committee became members of the nine

nial census of the United States is taken, the governor shall forthwith appoint a commission designated by the president pro tempore of the senate, the speaker of the house of representatives, the minority leader of the senate and the minority leader of the house of representatives, each of whom shall designate two members of the commission, provided that there are members of no more than two political parties in either the senate or the house of representatives. In the event that there are members of more than two political parties in a house of the general assembly, all members of that house belonging to the parties other than that of the president pro tempore of the senate or the speaker of the house of.representatives, as the case may be, shall select one of their number, who shall designate two members of the commission in lieu of the designation by the minority leader of that house. The eight members of the commission so designated shall within thirty days select an elector of the state as a ninth member.

"c. The commission shall proceed to consider the alteration of districts in accordance with the principles recited in this article and it shall submit a plan of districting to the secretary of the state by the thirtieth day of the November next succeeding the appointment of its members. No plan shall be submitted to the secretary unless it is certified by at least five members of the commission. Upon receiving such plan the secretary shall publish the same forthwith, and, upon publication, such plan of districting shall have the full force of law. If the commission shall fail to submit such a plan by the thirtieth day of November, the secretary of the state shall forthwith so notify the chief justice of the supreme court.

"d. Original jurisdiction is vested in the supreme court to be exercised on the petition of any registered voter whereby said court may compel the commission, by mandamus or otherwise, to perform its duty or to correct any error made in its plan of districting, or said court may take such other action to effectuate the purposes of this article, including the establishing of a plan of districting if the commission fails to file its plan of districting by the thirtieth day of November as said court may deem appropriate. Any such petition shall be filed within thirty days of the date specified for any duty or within thirty days after the filing of a plan of districting. The supreme court shall render its decision not later than forty-five days following the filing of such petition or shall file its plan with the secretary of the state not later than the fifteenth day of February next following the time for submission of a plan of districting by the commission. Upon receiving such plan the secretary shall publish the same forthwith, and, upon publication, such plan of districting shall have the full force of law."

.member commission, which also inherited the committee's records and computer data bases. The commission arrived at a reapportionment plan for the House of Representatives consisting of 151 districts with a maximum population deviation of 8.779 percent. The petition challenging the validity of the plan was then brought to this court.

The petitioners claim, first, that article third, § 6 (d) of the Connecticut constitution requires this court to act, not as a court, but as a superlegislature in reviewing the commission's plan. Second, the petitioners claim that, however this court views its jurisdiction, the commission's plan must be set aside because it unnecessarily violates the town integrity principle contained in article third, § 4 of the Connecticut constitution. We will consider these claims in turn.

I

The petitioners' contention that the constitution confers legislative powers upon this court to correct and to implement a plan for redistricting has four overlapping bases. They ask us to note that: (1) article third is the legislative and not the judicial article of the constitution; (2) article third, § 6 (d) would require this court to establish a plan of districting, and thus necessarily to undertake a legislative role, had the commission produced no plan at all; (3) article third provides no avenue for judicial review of the commission's response to a mandate from this court for revision of a reapportionment plan; and (4) the constitution singles out a reapportionment plan promulgated by a commission, as distinguished from such plans devised by the General Assembly, for special judicial scrutiny under article third, § 6 (d). Although these textual arguments require serious consideration, we are unpersuaded.

Analysis of the governmental structure created by our constitution must begin with the central role that the constitution assigns to the principle of separation of powers. "Prior to the adoption of our first constitution in 1818, legislative, executive and judicial powers had been centered in, and exercised by, the General Assembly and its predecessor, the General Court. One of the great achievements, if not the greatest achievement, of the constitution of 1818 was the division of the powers of government into three distinct departments, legislative, executive and judicial, each confided to a separate magistracy. . . . This separation was accomplished by article 2 of the constitution of 1818 entitled 'Of the Distribution of Powers', which read as follows: 'The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy—to wit—those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.' This provision, unchanged except for insignificant variations in punctuation, was carried into the constitutions of 1955 (article 2) and 1965 (article 2)." (Citations omitted.) *Adams* v. *Rubinow,* 157 Conn. 150, 153–54, 251 A.2d 49 (1968).

"[T]he separation of powers provision of our constitution forbids the imposition upon a judge . . . of clearly nonjudicial powers or duties." Id., 175. Thus we have held unconstitutional an act conferring on the Probate Court administrator the power to fix fees; id.; and a statute giving courts the power of regulating the location, construction, and operation of street railways. *Appeal of Norwalk Street Ry. Co.,* 69 Conn. 576, 37 A. 1080 (1897).

Even a principle that is rooted in the constitution can, of course, be abrogated by constitutional amendment. See *In re Interrogatories Propounded by Senate,* 536 P.2d 308, 318 (Colo. 1975). We will not, however, pre-

sume an intent to make a radical revision of a long established constitutional principle. Without a clear showing that the provisions of article third were intended to override those contained in article second, this court will not undertake functions that fall outside our judicial role.

The text of article third, § 6 (d) does not unambiguously demonstrate an intent to confer legislative rather than judicial powers upon this court. Significantly, § 6 (d) uses judicial terms to describe this court's responsibilities. "Original jurisdiction" is "vested" in this court. We may act only in response to a "petition." We have the power "to correct any error," or to compel the commission to perform its duty by "mandamus." Not later than forty-five days from the filing of the petition, this court "shall render its decision." This terminology is not normally associated with the assignment of legislative power. Furthermore, nothing in the legislative history of the adoption of § 6 (d) demonstrates any intent to enlarge the powers of this court to have us act as a superlegislature.

A construction of article third, § 6 (d) that ordinarily confines courts to an exercise of judicial powers makes sense when the constitutional provisions governing reapportionment are examined as a whole. Our constitution envisages three different reapportionment scenarios. When the General Assembly promulgates a reapportionment plan, a state court challenge to the validity of that plan must be mounted by filing a declaratory judgment action invoking the equity powers of the Superior Court. See *Miller* v. *Schaffer,* 164 Conn. 8, 19, 320 A.2d 1 (1972); see also *Logan* v. *O'Neill,* 187 Conn. 721, 448 A.2d 1306 (1982). When a reapportionment commission promulgates a reapportionment plan, article third, § 6 (d) confers expedited direct jurisdiction on this court to consider the validity of such a challenge. Only when a reapportionment commission fails

to promulgate a reapportionment plan at all is this court given direct, legislative authority to fill the constitutional vacuum.

We reject the petitioners' contention that a residual provision for an extraordinary remedy to deal with dual failure by the legislature and the commission to promulgate a timely reapportionment plan enlarges the scope of our responsibility when the legislature or the commission has acted in timely fashion. The provisions of article third themselves rebut such an argument. Once a duly appointed reapportionment commission publishes a redistricting plan, article third, § 6 (c) prescribes that "such plan of districting shall have the full force of law." Thereafter, this court's review of the validity of the plan, like any other judicial review, is impliedly limited to an inquiry into the plan's compliance with applicable state and federal constitutional mandates. Such a review invokes this court's judicial authority and does not warrant our exercise of legislative power.

The practical consequences of a different construction of article third, § 6 also counsel against acceptance of the petitioners' claim that this court should act as a superlegislature. As a superlegislature, we would presumably not be bound by the decisions reached by the commission, rendering its work essentially for nought. If that were the case, it would be pointless to have detailed constitutional attention paid to the composition of a commission, or to burden the commission with the heavy task of devising a plan within two and one-half months, when its judgments could so readily be overridden.

We recognize that article third, § 6 imposes upon this court the duty to undertake a review of a commission-generated reapportionment plan that extends beyond our normal appellate jurisdiction. We must act upon a limited record in a limited time frame. Furthermore,

there is no provision for the ordinary process of fact-finding by another body, such as a trial court or administrative agency. We conclude, however, that even in these exigent circumstances, we do not sit as a super-legislature charged with fashioning a reapportionment plan de novo when the commission has submitted a redistricting plan that we are obliged to review for a claimed error. The scope of our review is governed by our judicial power and is therefore limited to a determination of whether the plan promulgated by the commission with "the full force of law" conforms to applicable state and federal constitutional mandates.

## II

The petitioners next claim that even if we disagree with their contention about the enlarged scope of our jurisdiction, the commission's plan must be rejected, within the ordinary exercise of judicial review, because the plan's districting for the House of Representatives excessively and unnecessarily violates the town integrity principle contained in article third, § 4 of the Connecticut constitution. In evaluating this constitutional challenge, we need to consider two issues. We must first decide what standard of review governs our review of the commission's plan. We must then determine whether the petitioners have met their burden of proving unconstitutionality by relying solely on the undisputed fact that the reapportionment plan establishes house districts that cross town lines.

## A

The constitutional provision on which the petitioners base their challenge to the validity of the reapportionment plan is the town integrity principle. Although article third, § 4, as amended, provides, in relevant part, that "[f]or the purpose of forming assembly districts no town shall be divided except for the purpose of forming assembly districts wholly within the town," the fol-

lowing section goes on to mandate that "[t]he establishment of . . . districts in the general assembly shall be consistent with federal constitutional standards." Conn. Const., art. III, § 5, as amended. "As a practical matter, the federal one-person, one-vote principle; see *Reynolds* v. *Sims,* 377 U.S. 533, 577, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); makes it impossible for a reapportionment plan to comply fully with the town integrity principle." *Logan* v. *O'Neill,* supra, 727; *Miller* v. *Schaffer,* supra, 24.

In our review of a reapportionment plan that concededly draws district lines so as to violate the principle of town integrity, we must first determine what a petitioner must show in order to establish a prima facie case of invalidity that we must "correct" under article third, § 6 (d). In the case of a reapportionment plan promulgated by the General Assembly, we have held that the mere crossing of town lines was insufficient to establish a prima facie case of the plan's invalidity or to shift the burden of proving its validity to the state. "Although . . . the legislative action being challenged [was] not a statute and thus [was] not subject to the approval of the governor, it [was] entitled to at least the same judicial respect as a statute. The burden on one attacking the constitutionality of a statute is great. There is a presumption of constitutionality which attaches to a statutory enactment; the burden which rests upon a party asserting its invalidity is to establish that it is unconstitutional beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *Logan* v. *O'Neill,* supra, 729.

The petitioners contend, however, that a reapportionment plan that does not fully respect the principle of town integrity warrants less judicial deference when the plan is devised by a reapportionment commission than when it is devised by the General Assembly. They

maintain that the special supervisory powers conferred upon this court by article third, § 6 (d) distinguish this case from *Logan* v. *O'Neill.* We are unpersuaded.

*Logan* v. *O'Neill,* supra, relied substantially on *Miller* v. *Schaffer,* supra, 12, in which this court upheld a similarly vulnerable plan that had been adopted by a public board, when, as in this case, the General Assembly had been unable to agree on a redistricting plan. Since we have, in part I of this opinion, construed article third, § 6 (d) as designed primarily to afford a judicial, albeit expedited, hearing for a challenged reapportionment plan, we conclude that *Logan* v. *O'Neill* and *Miller* v. *Schaffer* furnish proper guides for the scope of our review. These cases exemplify well established judicial principles that regularly attach a presumption of validity to decisions of authorized public agencies. "Because public officers, acting in their official capacities, are presumed, until the contrary appears, to have acted legally and properly; *Brookfield* v. *Candlewood Shores Estates, Inc.,* 201 Conn. 1, 7, 513 A.2d 1218 (1986); *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles,* 165 Conn. 559, 568, 345 A.2d 520 (1973); *Hills* v. *Zoning Commission,* 139 Conn. 603, 608, 96 A.2d 212 (1953); the burden on such a claim rests upon the person asserting it." *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 537, 525 A.2d 940 (1987). Indeed, in our review of the legislative actions of local zoning commissions, we have regularly searched the record for evidence to sustain such decision making. See, e.g., *Gagnon* v. *Inland Wetlands & Watercourses Commission,* 213 Conn. 604, 607–608, 569 A.2d 1094 (1990), and cases therein cited. We can discern no principled reason why the actions of a reapportionment commission should not warrant similar deference.

When our original jurisdiction over commission-generated reapportionment plans was created by constitutional amendment in 1976, the constitution of 1965

already recognized the inherent conflict between federal constitutional requirements for fair voting standards and the principle of town integrity. *Miller* v. *Schaffer*, supra, decided in 1972, had already validated a reapportionment plan that manifested such a conflict. In light of this history, we are persuaded that a petitioner cannot meet his burden of establishing a prima facie case of constitutional invalidity merely by demonstrating that a reapportionment plan crosses town lines. We reaffirm that a person challenging a reapportionment plan for violations of the town integrity principle must demonstrate "that towns were cut in the adopted plan for reasons other than to meet the federal equal population requirement or that the challenged plan was not the legislature's best judgment in harmonizing the conflicting constitutional requirements." *Logan* v. *O'Neill*, supra, 740.

It is true, as the amicus city of Hartford notes, that the truncated time frame established for judicial review of reapportionment plans under article third, § 6 (d) makes it difficult for a challenger to create a plenary record to document an unreasonable disregard of town lines. That difficulty may result from the constitutional drafters' perceived need to balance the risk of time-consuming intrusions into electoral processes against the benefit of correcting fundamental errors in reapportionment plans. Even without a plenary record, this court could entertain a challenge on the grounds that the one person, one vote principle is violated by the gross numerical overrepresentation of some districts and underrepresentation of others. Cf. *Matter of Sherrill* v. *O'Brien*, 188 N.Y. 185, 198, 81 N.E. 124 (1907) (invalidating apportionment which "is beyond all reasonable controversy, a gross and deliberate violation of the plain intent of the Constitution and a disregard of its spirit and the purpose for which express limitations are included therein"); *State ex rel. Attorney Gen-*

*eral* v. *Cunningham,* 81 Wis. 440, 484, 51 N.W. 724 (1892) ("[i]f, as in this case, there is such a wide and bold departure from this constitutional rule that it cannot possibly be justified by the exercise of any judgment or discretion, and that evinces an intention on the part of the legislature to utterly ignore and disregard the rule of the constitution in order to promote some other object than a constitutional apportionment, then the conclusion is inevitable that the legislature did not use any judgment or discretion whatever"). If a challenger requires the benefit of discovery and testimony in order to establish his claim, he presumably may seek plenary relief to test the plan's invalidity in a suit in Superior Court.[2]

## B

The petitioners assert that there is evidence, in this case, that the reapportionment plan violated the town integrity principle for reasons other than compliance with federal constitutional requirements. They assert that the commission voluntarily undertook to devise special minority districts in accordance with what the commission believed to be the requirements of the federal Voting Rights Act, 42 U.S.C. § 1973 et seq.[3] The

---

[2] The parties have not briefed or argued the issue of whether this alternate remedy has been foreclosed by article third, § 6 (d).

[3] The Voting Rights Act, as amended, provides in pertinent part: "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b (f) (2) of this title, as provided in subsection (b) of this section.

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected

petitioners do not dispute that, under the supremacy clause of the United States constitution, the Voting Rights Act is binding on Connecticut. See, e.g., *Fitzpatrick* v. *Bitzer,* 427 U.S. 445, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976). They claim, however, that the commission should have to prove the applicability of the Voting Rights Act and that the commission has not done so. See *Kenai Peninsula Borough* v. *State,* 743 P.2d 1352, 1361 (Alaska 1987).

The petitioners' argument is flawed in two ways. First, the argument is premised factually on a questionable inference from one statement by one commis-

class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C.A. § 1973 (Sup. 1991).

This "totality of the circumstances" test evidently leaves a great deal to the judgment of the trier of fact in a suit brought under the act. The Senate Judiciary Committee majority report accompanying the bill that amended § 2 elaborates on the circumstances that might be probative of a violation, and notes the following "typical factors": " '1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2. the extent to which voting in the elections of the state or political subdivision is racially polarized; 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process; 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; 6. whether political campaigns have been characterized by overt or subtle racial appeals; 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.' " *Thornburg* v. *Gingles,* 478 U.S. 30, 36–37, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986). Other factors " 'that in some cases have had probative value' " include " 'whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group' " and " 'whether the

sion member, without any evidence of the extent to which his opinion reflected the understanding of the commission as a whole. Second, there has been no showing of a causal connection between the commission's concerns about the Voting Rights Act and its departures from the town integrity principle.

The only evidence that the petitioners offer to support their claim that the Voting Rights Act concerns caused the commission to override the town integrity principle is a statement by Representative Robert F. Frankel, one of the commission's members, at the final meeting of the commission. Frankel stated that "[t]he

policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.' " Id., 37. Moreover, "this list of typical factors is neither comprehensive nor exclusive," "other factors may also be relevant and may be considered," and "the Senate Committee observed that 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.' " Id., 45.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Id., 47. The failure to create districts in which minorities are present in sufficiently large numbers to elect a representative of their choice may, under some circumstances, violate the act. "Dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." Id., 46 n.11; see *Ewing* v. *Monroe County,* 740 F. Sup. 417 (N.D. Miss. 1990) (dilution of a cohesive, contiguous black population violated act); *Gunn* v. *Chickasaw County,* 705 F. Sup. 315 (N.D. Miss. 1989) (same); *Rybicki* v. *State Board of Elections,* 574 F. Sup. 1147 (N.D. Ill. 1983) (excessive concentration of black voters violated act).

At the public hearings on the reapportionment plan, a number of persons warned the committee that unless minority concerns were accommodated by the plan, litigation would likely ensue. As *Logan* v. *O'Neill,* 187 Conn. 721, 448 A.2d 1306 (1982), establishes, however, we need not decide today whether an alternative plan would in fact either have violated the Voting Rights Act or have crossed fewer town lines  The petitioners have offered no evidence linking minority concerns or the creation of "influence districts" with a greater intrusion into the town integrity principle than was required by the principle of one person, one vote.

State of Connecticut experienced a significant increase in minority population during the 1980s and we sought to insure that this increase would be reflected in representation in the State House. . . . Every attempt was made to create 'effective minority districts' and black and Latino influence districts where possible. We understood that the Federal Courts have not required 'influence districts' but believe [that] it is in the best interests of the minority community of Connecticut to develop a plan that would maximize the ability of the minority community to elect candidates of their choice. We feel confident that the redistricting plan satisfies all federal and state legal requirements." Reapportionment Commission, November 29, 1991 Minutes. The petitioners place great weight on Frankel's failure to mention the town integrity requirement expressly, and contrast his vague and passing reference to "state legal requirements" with his extensive discussion of the Voting Rights Act.

Frankel's statement does not, however, purport to be an exhaustive or definitive enumeration of the considerations taken into account in drafting the commission's plan. The relevant record also includes the hearings conducted by the General Assembly committee, during which there was extensive discussion of the town integrity principle. See *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra, 607–608. In the context of these earlier hearings, it is clear to us that Frankel's remarks were particularly directed to minority organizations that had threatened to challenge the plan under the Voting Rights Act if the voting strength of their constituents were diluted. Nothing in Frankel's remarks suggests that the creation of "influence districts" required the crossing of town lines that would not otherwise have had to be crossed, that any such district itself crossed town lines, or that the commission ignored or underestimated its duty to follow the town integrity requirement to the extent possible.

## C

Finally, the amicus city of Hartford contends that to place the burden of proof on the petitioners to establish an unjustified invasion of the town integrity principle would effectively nullify the relief intended to be made available by § 6 (d). The amicus contends that "any Reapportionment Commission, no matter how nefarious its purposes, would only have to ensure that its public record bespoke of no wrongdoing in order for its efforts to be upheld." We disagree that this will be the necessary result of our decision. Today's petitioners have not established, on this record, that this reapportionment commission entertained any nefarious purpose or produced an unconstitutional plan. We will not consider such an extreme argument until we are presented with a record that reasonably suggests it.

Judicial reluctance to become too deeply involved in reapportionment disputes is not confined to prudential concerns about entering the "political thicket." *Colegrove* v. *Green,* 328 U.S. 549, 556, 66 S. Ct. 1198, 90 L. Ed. 1432 (1946) (plurality opinion of Frankfurter, J.). It also stems from the inherent unsuitability of such disputes to the ordinary and traditional principles of adjudication.

As the United States Supreme Court has observed, "districting inevitably has and is intended to have substantial political consequences." *Gaffney* v. *Cummings,* 412 U.S. 735, 753, 93 S. Ct. 2321, 37 L. Ed. 2d 298 (1973). Thus, for example, it is legitimate to draw district lines "with the conscious intent to create a districting plan that would achieve a rough approximation of the statewide political strengths of the Democratic and Republican Parties, the only two parties in the State large enough to elect legislators from discernible geographic areas." Id., 752. As Alexander Bickel

has observed, "apportionment is necessarily a very high percentage of politics with a very small admixture of definable principle." A. Bickel, The Least Dangerous Branch (1962) p. 193. This is why it is better for reapportionment to be done by a politically accountable and accessible legislature or commission than in the cloistered chambers of a court. One rationale for the constitutional scheme assigning this task to us only as a last resort is to be found in an assessment of comparative political expertise. Agreement by politically sophisticated decisionmakers in the first instance may be made more likely by the in terrorem effect of the knowledge that otherwise a court untutored in political realities would undertake so politically sensitive an assignment.[4]

Courts are justifiably reluctant to rule on political questions that they lack the competence to adjudicate judiciously. "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker* v. *Carr,* 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Professor Tribe observes that this statement of the doctrine draws upon three different theories of the role of the court. The first consideration enumerated in

---

[4] But see *Wilson* v. *Eu,* 54 Cal. 3d 471, 816 P.2d 1306, 286 Cal. Rptr. 280 (1991) (en banc) (appointing special master to hold public hearings after legislature and governor could not agree on reapportionment plan).

*Baker* reflects a "classical" view, which would deem a case nonjusticiable only if the court finds, "purely as a matter of constitutional interpretation, that the Constitution itself has committed the determination of the issue to the autonomous decision of another agency of government." L. Tribe, American Constitutional Law (2d Ed. 1988) § 3-13, p. 96 and see id., pp. 96–97. The last three considerations reflect a "prudential" view, which would avoid adjudication "when reaching the merits would force the Court to compromise an important principle or would undermine the Court's authority." Id. Finally, the second and third considerations incorporate a "functional" view, which would have the court "consider such factors as the difficulties in gaining judicial access to relevant information, the need for uniformity of decision, and the wider responsibilities of the other branches of government, when determining whether or not to decide a certain issue or case." Id. Tribe observes that these three theories are, to some extent, in tension. They can also, however, be mutually reinforcing.

Prudential and functional considerations are relevant to the classical enterprise of constitutional interpretation, especially where, as here, the constitutional provisions at issue are so remarkably open-textured. See *Department of Commerce* v. *Montana,* U.S. , 112 S. Ct. 1415, 1426–30, 118 L. Ed. 2d 87 (1992). The question of whether the town integrity principle was adequately taken into account is difficult to adjudicate, precisely because of "a lack of judicially discoverable and manageable standards for resolving it." It is impossible to decide with specificity how to balance the town integrity principle against the relevant principles of federal law "without an initial policy determination of a kind clearly for nonjudicial discretion." For this court to discard the commission's plan and start anew, absent any showing that the commission failed to perform its

duty properly, would express "lack of the respect due coordinate branches of government." *Baker* v. *Carr,* supra, 217.

The amicus city of Hartford complains that the commission has placed only five house districts entirely within the city's borders, while another four are shared by the city and the towns of Bloomfield, Windsor, Wethersfield, Rocky Hill and West Hartford.[5] By contrast, under the existing plan adopted after the 1980 census, six house districts are wholly within the city's borders, while one additional district is comprised of voters from both Hartford and Bloomfield. This decrease in districts wholly within Hartford has occurred even though the city's population has increased relative to that of the neighboring towns. The commission correctly responds, however, that two of the districts that cross town lines each have a clear majority of Hartford residents, so that the number of districts in or controlled by Hartford residents remains at seven. Furthermore, the commission has claimed, without contradiction, that there are several municipalities that share fewer intertown districts than they did under the previous plan.[6]

Similarly, the amicus city of New Haven points out that its city code, § 3.4, requires that new ward boundaries be drawn "so that each ward under the new districting plan shall lie completely within a single

[5] The dissent states that "the spanning of the 29th assembly district across the borders of three towns, Hartford, Wethersfield, and Rocky Hill, appears to be particularly egregious." It appears clear that Rocky Hill's district *must* include other towns, because Rocky Hill's population is too small for that town to have its own district. The fact that the deficit was supplied by more than one town does not, in itself, seem particularly egregious. It is far from clear that the town integrity principle required the drafters to take a bigger bite out of a single town.

[6] The parties have not provided this court with a map detailing the specific changes in district lines between the current plan and that enacted in 1981.

assembly district for the state house of representatives." Because the new 88th house district, most of which is in North Haven and Hamden, incorporates 3334 New Haven citizens, and because the one person, one vote principle applies to city wards, ward size will have to be decreased from the current average of 4203 to parallel this segment. This, the city projects, will require an increase of approximately 30 percent in the number of wards and aldermen, creating a board of unwieldy size. This result could have been avoided, the city argues, if its lines had not been crossed. Although New Haven's predicament is required by the city's own charter, which it is free to alter, we recognize that it would be better for New Haven if its borders had not been crossed in redistricting.

The constitution, however, recognizes, and requires the Reapportionment Commission to recognize, that it would be better for *every* town not to have its lines crossed. The town integrity principle does not apply to some towns more than others. It is true that if the commission had begun with Hartford (or with any other single city), it could have devised a plan with, at most, one district crossing the lines of that city. This would, however, have created ripple effects across the state and could possibly have resulted in the crossing of more town lines, in total, than would have been necessary had that city not been singled out for special treatment. Such special treatment of any particular town may thus itself violate the town integrity principle, which requires the commission to cross as few town lines as possible. No town is entitled to be the center that all others must accommodate.

In *Logan* v. *O'Neill*, supra, we rejected a claim that the town integrity principle had been violated because fewer town lines could have been cut if a higher population deviation had been tolerated. This contention "amount[ed] to a claim that the town integrity princi-

ple requires the General Assembly to adopt as high a maximum population deviation as possible so as to achieve the resulting decrease in town segmentation." Id., 735. This claim, we observed, was "based on a misunderstanding of the nature of the federal one person, one vote principle and its impact on legislative districts in Connecticut." Id. Even if a higher population deviation would have been tolerated by the courts, "the point of the one person, one vote principle is to achieve equality in voting districts to the nearest extent practicable," and not "to achieve the greatest inequality that can survive a court challenge." Id., 736. The town integrity principle and the one person, one vote principle conflict with one another, but both are binding on the decisionmaker, which therefore must be afforded some discretion in striking a balance between them. Faced by a multiplicity of rational solutions, none of which perfectly satisfies all of the applicable criteria, courts in other jurisdictions have also upheld the validity of challenged reapportionment plans. See *Kenai Peninsula Borough* v. *State,* 743 P.2d 1352, 1357 (Alaska 1987); *Preisler* v. *Doherty,* 365 Mo. 460, 465, 284 S.W.2d 427 (1955); *Matter of Schneider* v. *Rockefeller,* 31 N.Y.2d 420, 427, 293 N.E.2d 67, 340 N.Y.S.2d 889 (1972); *Matter of Sherrill* v. *O'Brien,* 188 N.Y. 185, 198, 81 N.E. 124 (1907); *Ater* v. *Keisling,* 312 Or. 207, 214, 819 P.2d 296 (1991); *In re Reapportionment Plan for Pennsylvania General Assembly,* 497 Pa. 525, 537, 442 A.2d 661 (1981).

While the petitioners would place on the commission the burden of proving the validity of any reapportionment plan that, on its face, departs from the town integrity principle, they have not explained how they would expect this burden to be met. As a matter of first impression, it appears to us that the burden must be either trivial or impossible. If, as *Logan* v. *O'Neill* implies, the commission's burden is merely to articu-

late a plausible reason for drawing the lines it did, the commission will invariably meet its burden, and the only likely effect of a further inquiry will be to delay a reapportionment process that the constitution clearly intends to be completed as speedily as possible. If, on the other hand, the commission must justify every line it has drawn, and show that it has devised the one unique solution to the conflicting imperatives to which it is subject, then it could never meet this burden, because there is and can be no such unique solution.[7] The constitutional provision authorizing a commission to undertake to promulgate a reapportionment plan would be rendered meaningless.

We do not need to decide today under what circumstances a petitioner challenging a reapportionment plan would produce sufficient evidence of a constitutional violation to require the plan's sponsors to prove its validity. Courts in other jurisdictions have uniformly required a petitioner to make a prima facie showing of some evidence inconsistent with the state's faithful discharge of its constitutional responsibilities before they have countenanced such a shifting of the burden of proof.[8] See *Kenai Peninsula Borough* v. *State, supra,* 1358 (placing burden on the state to justify undisputed

---

[7] As Representative Richard Foley, Jr., explained at one of the Reapportionment Commission's hearings, "there's a child's toy I can recall from when my daughter was young where you would push in on one side, it would pop out on the other. And when you push in, in redistricting on the map on one side, and adjusted it, it pops out some place else. . . . So what happens in Greenwich can affect New London . . . . [W]hen this is finished, it will be effectively, the map will look like a jigsaw puzzle. The difference is all the pieces must fit. We can't have a little bit left over when we're done." Reapportionment Commission, April 2, 1991 Public Hearing.

[8] Instead of requiring a prima facie showing of a constitutional violation, the dissent would shift the burden of proof if the petitioner "comes forward with some substantial evidence that the violation of the town integrity rule was not required because of federal law or other state constitutional law." Because none of the facts cited by the dissent are inconsistent with the state's faithful discharge of its responsibilities, it is not clear that even this relaxed standard has been satisfied by the petitioners.

population deviation of 14.8 percent); *Hellar* v. *Cenarrusa*, 104 Idaho 858, 861, 664 P.2d 765 (1983) ("After reviewing five reapportionment plans submitted by the plaintiffs, the district court concluded that a redistricting plan could be adopted with only minor variation in population, but which would follow county boundary lines, and thus accommodate both state and federal constitutional requirements."); *Schrage* v. *State Board of Elections*, 88 Ill. 2d 87, 98, 430 N.E.2d 483 (1981) (assessing compliance with compactness requirement by "rely[ing] on a visual examination of the questioned district," and finding "a tortured, extremely elongated form which is not compact in any sense"); *In re Legislative Districting of General Assembly*, 193 N.W.2d 784, 788 (Iowa 1972) ("[t]he legislator-witnesses frankly acknowledge the effect of [measures taken to protect incumbents] on the numerical equality goal was not considered"); id., 790 (alternative plan demonstrates "that plans more equal in population can be developed"); id., 791 (noting "strange shapes" in shifting burden of proving compliance with compactness requirement); *Preisler* v. *Doherty,* supra, 468 ("[I]t appears from the Board's own estimate that the most extreme violations of the standard of compactness . . . were not made for the purpose of obtaining equality of population but instead created the greatest inequality."); *In re Livingston,* 160 N.Y. Sup. 462, 469–70, 96 Misc. 341 (1916) (challenged district "is not capable of being described by any language that would convey a true idea of its appearance. It is most irregular in shape. In fact it is really grotesque. . . . If the constitutional provision relating to compactness means anything, this district, as laid out, manifestly does not conform to it."); *State ex rel. Lockert* v. *Crowell,* 656 S.W.2d 836, 838 (Tenn. 1983) ("the drafters of the House plan admitted that no effort was made to hold county divisions to a minimum"); *Clements* v. *Valles,* 620 S.W.2d 112, 115 (Tex.

1981) ("appellees presented evidence of a number of alternate redistricting plans which maintain more of the surplus populations within county lines" without violating federal requirements).[9]

Our decision that the present petitioners have not made the requisite prima facie showing of unconstitutionality "in no way alters the fact that the town integrity principle is an operative part of our constitution and is a significant constraint on the [commission's] reapportionment authority." *Logan* v. *O'Neill, supra,* 740. It does not trivialize a state constitutional requirement to recognize that its operational scope must be reconciled with the superior commands of the United States constitution or to recognize that the primary responsibility for such a reconciliation of competing constitutional principles rests with legislative agents rather than with the judiciary. Constitutional requirements are binding on all branches of government and do not depend exclusively on judicial enforcement. See generally L. Sager, "Fair Measure: The Legal Status of Underenforced Constitutional Norms," 91 Harv. L.

---

[9] Some of these cases are cited by the dissent to support the proposition that, notwithstanding the federal one person, one vote requirement, "violations of state constitutional mandates in the reapportionment of the legislature require the drafters of the plan to justify the same." These cases, however, rely on far stronger evidence of constitutional violations than that proffered by the petitioners here. It is true that a single case cited by the dissent does hold that, once a facial violation of a state constitutional mandate is shown, the presumption of the reapportionment plan's validity is extinguished and the state has the burden of proving the plan's validity. *Smith* v. *Craddick,* 471 S.W.2d 375, 378 (Tex. 1971). This, however, like Justice Kauffman's dissent in *In re Reapportionment Plan for Pennsylvania General Assembly,* 497 Pa. 525, 547–50, 442 A.2d 661 (1981), implies what the dissent expressly rejects, the "extreme of shifting the burden of proof to the commission to justify the plan merely on proof that the town integrity principle was violated . . . ." Moreover, in the later case of *Clements* v. *Valles,* 620 S.W.2d 112, 115 (Tex. 1981), the Supreme Court of Texas relied on substantive evidence that alternate redistricting plans were possible that would better have harmonized state and federal constitutional requirements.

Rev. 1212 (1978). On the present record, we will not presume that the commission has ignored its constitutional duty.

The petition is denied.

In this opinion CALLAHAN, GLASS, COVELLO and BORDEN, Js., concurred.

SHEA, J., concurring. I agree with part I of the majority opinion, in which we hold essentially that, when a reapportionment plan has been promulgated by a reapportionment commission, the duty imposed on this court by article third, § 6 (d) of our state constitution, as amended, to determine whether there is "any error made in its plan of districting" does not involve the exercise of legislative powers and thus violate the separation of powers principle inherent in the "separate magistracy" provision of article second.[1] I also agree with parts II A and II B of the opinion, in which we conclude that the orthodox rule allocating the burden of proof to the challenger of a decision by a public agency is applicable to a petition pursuant to § 6 (d) and that the petitioners have not sustained that burden. They have failed to present any redistricting plan whatsoever, let alone a plan that achieves a better balance between town integrity and equality of population in each district than the plan of the commission.

I do not join part II C of the majority opinion because it addresses several issues not presently before us and may be construed to indicate reluctance on our part to deal with such issues if they should arise in the future. Those issues, which involve the adjudication of

---

[1] Article second of our state constitution provides as follows: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

arguably political questions and the absence of defined standards for application by the judiciary, would be presented only when both the legislature and the reapportionment commission had failed to produce a redistricting plan. In such event the obligation imposed on this court may well be characterized as the exercise of legislative power by a court acting as a "superlegislature." Nevertheless, § 6 (d) does include among the remedies authorized, in the event of such a failure by the legislative branch, "the establishing of a plan of districting." If other remedies should prove ineffectual, this court could hardly shirk its constitutionally imposed duty to formulate a redistricting plan, despite the difficulties to be encountered. I see no useful purpose in fettering this court with obiter dicta concerning problems that may arise in the future but are not presented by this case.

BORDEN, J., with whom CALLAHAN, GLASS and COVELLO, Js., join, concurring. I write separately to respond to what I regard as a gratuitous and unjustified ad hominem attack in the first paragraph of the dissenting opinion on the performance by the majority of our judicial duties in this case. Neither I nor any other member of the majority has "trivialize[d] our state constitution" by our decision. We have done our best to interpret the constitution in the light of its language, history and structure, in the light of what we regard as the relevant precedents, and in the light of the facts of this case. Neither I nor any other member of the majority is guilty of giving "at best a cursory review" of those facts. We have, instead, considered the facts presented to us in the record of the case carefully and thoroughly, as is our duty as judges. Finally, neither I nor any other member of the majority "decide[d] to rubber stamp" the districting plan at issue in this case. We have with equal care and thoroughness measured that plan in accordance with what we

consider to be the appropriate constitutional standards, including what we regard as the burden placed by the constitution on the challengers to the validity of that plan. It is regrettable that the dissenter's disagreement with our conclusions somehow suggests to him that we have not performed our judicial function with the same sense of seriousness with which he has performed his.

BERDON, J., dissenting. Today the majority trivializes our state constitution by failing to give meaning to the mandate of article third, § 4, which provides in clear and unambiguous language that "[f]or the purpose of forming assembly districts no town shall be divided except for the purpose of forming assembly districts wholly within the town."[1] This is commonly referred to as the "town integrity" principle. Indeed, with at best a cursory review of the undisputed facts before us, the majority decides to rubber stamp the 1991 Plan of Districting of the General Assembly of the state of Connecticut (1991 Plan), which was adopted by the reapportionment commission (commission) pursuant to article third, § 6 (b) of the state constitution, as amended by articles XII, XVI, XXVI of the amendments.[2]

The petitioners, John W. Fonfara, Alphonse S. Marotta, Eugenio Caro, Sr., Raul A. Rodriguez, Joseph S. Payne and T. Gregory Teasley, registered voters of the state and residents of the city of Hartford, have invoked this court's original jurisdiction under article

[1] Article third, § 4 of the state constitution, as amended by articles II and XV of the amendments, requires that the "house of representatives shall consist of not less than one hundred twenty-five and not more than two hundred twenty-five members, each of whom shall have attained the age of eighteen years and be an elector residing in the assembly district from which he is elected. Each assembly district shall be contiguous as to territory and shall elect no more than one representative. For the purpose of forming assembly districts no town shall be divided except for the purpose of forming assembly districts wholly within the town."

[2] See footnote 1 of majority opinion.

third, § 6 (d) of the state constitution, as amended. They first argue that when our original jurisdiction is invoked under article third, § 6 (d), as amended, we are required to act as a superlegislature to adopt our own plan of reapportionment. I disagree with the petitioners and agree with part I of the majority opinion that, in this instance, we do not act with legislative powers; rather, we are required to review the 1991 Plan and, if necessary, "compel the commission . . . to perform its duty or to correct any error made in its plan of districting . . . ." Article third, § 6 (d) of the constitution, as amended, does bestow upon us legislative powers, but that is only when "the commission fails to file its plan of districting," which is not the case before us.

The petitioners focus their complaint on the city of Hartford. Under the 1991 Plan, Hartford will have five assembly seats located wholly within its boundaries and will share four seats with the towns of Wethersfield, West Hartford, Windsor, Rocky Hill and Bloomfield. Because each assembly district elects a member of the House of Representatives, Hartford must share representatives with each of these towns.[3] Conn. Const.,

---

[3] The following is a list of districts that include residents from the city of Hartford and the other town or towns included in that district under the 1991 Plan.

| Assembly District Number | Towns within Assembly District |
|---|---|
| 1 | Hartford and Bloomfield |
| 2 | Hartford |
| 3 | Hartford |
| 4 | Hartford |
| 5 | Hartford |
| 6 | Hartford |
| 7 | Hartford and Windsor |
| 20 | Hartford and West Hartford |
| 29 | Hartford, Rocky Hill and Wethersfield |

art. III, § 4. On its face, the 1991 Plan violates the town integrity principle by forming these four shared assembly districts.

Of course, our state constitution is the supreme law of this state, provided that it gives no fewer rights to our citizens than they are entitled to under the federal constitution; *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980); and provided that it is not trumped by federal law. U.S. Const., art. VI, clause 2; *Reitman* v. *Mulkey,* 387 U.S. 369, 87 S. Ct. 1627, 18 L. Ed. 2d 830 (1967). Our state constitution explicitly recognizes the federal supremacy principle in regard to the reapportionment of the state legislature by providing that the "establishment of districts . . . in the general assembly shall be consistent with federal constitutional standards." Conn. Const., art. III, § 5, as amended; *Logan* v. *O'Neill,* 187 Conn. 721, 726–27, 448 A.2d 1306 (1982).

Accordingly, in drafting a plan of reapportionment for the legislature, it is appropriate and, indeed, mandated that the "one person, one vote" principle enunciated in *Reynolds* v. *Sims,* 377 U.S. 533, 577, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964), be taken into account. It is correct that, "[a]s a practical matter, the federal one-person, one-vote principle makes it impossible for a reapportionment plan to comply fully with the town integrity principle." *Logan* v. *O'Neill,* supra, 727.[4] It must, however, be remembered that the United States Supreme Court has made it clear that mathematical precision need not be complied with as long as the deviation is based upon rational state policy considerations. "So long as the divergences from a strict population

[4] The state of Connecticut has 169 towns, whose population ranges from as few as 612 (town of Union) to as many as 141,686 (town of Bridgeport). Article third, § 4 of the Connecticut constitution, as amended, requires that there be one representative in each assembly district and that there be no less than 125 and not more than 225 representatives. See footnote 1, supra.

standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in . . . a bicameral state legislature." *Reynolds* v. *Sims,* supra, 579. The United States Supreme Court has further held that "[t]he policy of maintaining the integrity of political subdivision lines in the process of reapportioning a state legislature . . . is a rational one." *Mahan* v. *Howell,* 410 U.S. 315, 329, 93 S. Ct. 979, 35 L. Ed. 2d 320, modified, 411 U.S. 922, 93 S. Ct. 1475, 36 L. Ed. 2d 316 (1973). Indeed, in *Mahan* v. *Howell,* supra, the court upheld a 16 plus percent deviation in Virginia's reapportionment plan in order to maintain the integrity of political subdivisions within that state. Accordingly, any plan that violates the town integrity rule must be reviewed from the perspective that federal one person, one vote principles are not carved in stone and that some deviations can be tolerated. As the court held in *Reynolds* v. *Sims,* supra, 578, "[w]hat is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case."

The majority views this case solely through the lens of what the petitioner must prove in order to establish "a prima facie case of invalidity that we must 'correct' under article third, § 6 (d) [of our state constitution]." The majority states that "[w]e reaffirm that a person challenging a reapportionment plan for violations of the town integrity principle must demonstrate 'that towns were cut in the adopted plan for reasons other than to meet the federal equal population requirement or that the challenged plan was not the legislature's best judgment in harmonizing the conflicting constitutional requirements.' *Logan* v. *O'Neill,* supra, 740." I believe that *Logan* is inapposite mainly because it involved a reapportionment plan adopted by the legis-

lature. The plan adopted by this coordinate branch of government is entitled to "the same judicial respect as a statute," thereby placing the burden of establishing its unconstitutionality beyond a reasonable doubt upon the challenger. Id., 729. In the present case, the 1991 Plan is not one adopted by the legislature, but merely by a commission appointed by the governor and composed of nine persons, eight of whom happened to have been members of the legislature, but were not required to be so. Conn. Const., art. III, § 6 (d), as amended. The presumption of constitutionality for their actions evaporates when the result patently runs afoul of a state constitutional provision.[5]

The majority's analysis of the scope of our judicial review, which does not take into account the original jurisdiction of this court, is overly simplistic. Not only does the analysis fail to give any respect to our state constitution, but it ignores fundamental principles of constitutional interpretation. We have long held that "[e]ffect must be given to every part of and each word in our constitution . . . ." *Cahill* v. *Leopold,* 141 Conn. 1, 21, 103 A.2d 818 (1954). We must also assume that

[5] *Miller* v. *Schaffer,* 164 Conn. 8, 320 A.2d 1 (1972), upon which the majority also relies, must also be distinguished as being inapposite for several reasons. First, this court was not exercising original jurisdiction in reviewing the redistricting plan, but was hearing the appeal from the decision of the trial court, which upheld the plan as valid only for interim use for the November, 1972 election. Second, as this court repeatedly noted in *Miller,* both the trial court and this court were acutely aware that the plan was "the only option open to it for a 1972 election" and that "[m]andating a workable elections calendar was urgent because of the short time remaining before the November election." Id., 29. This court concluded that "[i]n the absence of such action by the Superior Court, the electors of this state would be deprived of their constitutional right provided by article third, § 8 of the constitution of Connecticut to elect members of the General Assembly at a general election to be held on the Tuesday after the first Monday of November in this year." Id., 25–26. Finally, this court expressly refrained from deciding the federal constitutional issues involved in the appeal because the issues were awaiting a hearing before the United States Supreme Court.

" 'infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing . . . the organic law of the state.' " *State* v. *Davis,* 199 Conn. 88, 98, 506 A.2d 86 (1986), quoting *Cahill* v. *Leopold,* supra, 19.

Other jurisdictions have clearly held that, notwithstanding the federal one person, one vote justification, violations of state constitutional mandates in the reapportionment of the legislature require the drafters of the plan to justify the same. So, in those jurisdictions once it is shown, for instance, that an assembly district includes more than one town in violation of the town integrity principle of the state constitution, the drafters must prove that federal law required the violation. See *Hellar* v. *Cenarrusa,* 104 Idaho 858, 860, 664 P.2d 765 (1983) (legislative redistricting plan invalid because it violated state constitutional provision against dividing county lines; "in order for the Fourteenth Amendment to displace the Idaho constitutional provision, there must be no possibility of compliance with both"); *In re Legislative Districting of General Assembly,* 193 N.W.2d 784, 790 (Iowa 1972) (Supreme Court of Iowa, exercising original jurisdiction, concluded that legislative redistricting plan was invalid because it violated state constitution requirement that each district to be "of compact and contiguous territory"; proponents of plan bear the burden of showing why the legislature could not comply with compactness requirement); *State ex rel. Lockert* v. *Crowell,* 656 S.W.2d 836, 839 (Tenn. 1983) (state's redistricting plan held invalid because it violated state constitution's prohibition against dividing counties; court would not "sanction a single county line violation [unless it was] shown to be necessary to avoid a breach of federal constitutional requirements"); *Clements* v. *Valles,* 620 S.W.2d 112, 114 (Tex. 1981) (state's 1981 redistricting plan deemed invalid; once the opponents to the plan established that plan violated

the constitutional provision against splitting districts, the proponents were "then required to justify the redistricting plan by presenting evidence that the cutting of county lines was necessary to satisfy the requirements of equal representation"); *Smith* v. *Craddick,* 471 S.W.2d 375, 378 (Tex. 1971) (state's 1971 redistricting plan invalid; "[commission] offered no evidence to establish that the wholesale cutting of county lines . . . was either required or justified to comply with the one-man, one-vote decisions. . . . If these districting requirements were excused by the requirements of the equal representation, the [commission] had the burden of presenting that evidence.").

The majority rejects as too extreme the amicus city of Hartford's position that if the burden is placed on the challenger to prove a prima facie case "any Reapportionment Commission, no matter how nefarious its purposes, would only have to ensure that its public record bespoke of no wrongdoing in order for its efforts to be upheld." That, however, is the very result of the standard of review that the majority adopts today. By requiring the petitioners to prove a prima facie case, notwithstanding the patent violations of the town integrity rule coupled with the lack of an opportunity for the petitioners to determine the basis for the plan[6] and the time restraints imposed by the constitution,[7] the majority grants carte blanche to the commission without, as a practical matter, any judicial review. I do not believe that the framers of the state constitution intended this result. Just as we presume that the legis-

---

[6] There were only twenty-one days between the date the petitioners filed this petition with the court on December 26, 1991, and the date oral argument was ordered for January 16, 1992. Not even an answer to the petition was required. Furthermore, the petitioners were required to file their brief within eleven days from the filing of the petition.

[7] Article third, § 6 (d) of the Connecticut constitution, as amended, requires the petitioner to file his or her petition to this court within thirty days after the filing of the plan of districting.

lature intended to reach a reasonable and rational result; *Zapata* v. *Burns,* 207 Conn. 496, 507–508, 542 A.2d 700 (1988); so must we ascribe the same intention to the framers of our constitution. The majority seems to address the problem of this procedural straitjacket by stating that the petitioners may go to the Superior Court to contest the plan's validity. The simple answer to this is that the constitution of the state of Connecticut gives these petitioners the right to be heard in *this* court, and we cannot deprive them of this constitutional procedure. Furthermore, by suggesting that the petitioners seek redress in the Superior Court, we violate our own rules. Once a remedy is prescribed, it is implied that the remedy is exclusive. See *Farricielli* v. *Personnel Appeal Board,* 186 Conn. 198, 204, 440 A.2d 286 (1982), quoting *State ex rel. Barlow* v. *Kaminsky,* 144 Conn. 612, 620, 136 A.2d 792 (1957) (" 'A statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in any other way.' ").

Because the framers of the constitution granted original jurisdiction to this court in order to determine the merits of the petitioners' claim and because of the time restraints they imposed, the burden should shift to the commission to justify the 1991 Plan with something less than a prima facie showing by the petitioners. We should reject the two extremes for judicial review of our original constitutional jurisdiction of reapportionment—that is, the one extreme of shifting the burden of proof to the commission to justify the plan merely on proof that the town integrity principle was violated and the other extreme of shifting that burden only on proof by the petitioner of a prima facie case of invalidity. Rather, we should borrow from our criminal law to provide a standard of review that would accommodate a presumption that the commission performed its functions in a constitutional manner, but at

the same time allow petitioners, who may have legitimate concerns, a meaningful review. That review should provide that once a petitioner challenging the plan of reapportionment comes forward with some substantial evidence that the violation of the town integrity rule was not required because of federal law or other state constitutional law, the burden should shift to the commission to prove that the federal or other state constitutional law did, in fact, require such intrusions. See, e.g., *State* v. *Evans,* 203 Conn. 212, 237–38, 523 A.2d 1306 (1987) (before the 1983 amendment to General Statutes § 53a-13 changing insanity to an affirmative defense, once the defendant introduced some substantial evidence tending to prove insanity, the state had the burden of proving beyond a reasonable doubt that the defendant was legally sane and responsible at the time of the offense); *State* v. *Pierson,* 201 Conn. 211, 217, 514 A.2d 724 (1986), appeal on remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989) ("the state bears the burden of disproving [duress and entrapment] once they are raised by the presentation of some evidence supporting them").

In the present case, there is substantial indisputable evidence that should *at least* shift the burden to the commission to prove that its carving up of Hartford was necessary under federal law. First, the 1991 Plan crosses the town lines in Hartford to create not one but four assembly districts that Hartford must share with five towns. Under the 1981 Plan, Hartford was required to share only one district. Furthermore, notwithstanding the increase in population of 3347 in Hartford for the 1990 census as compared to the 1980 census (in 1990 the population was 139,739 residents and in 1980 the population was 136,392 residents), the number of assembly districts wholly within Hartford under the 1991 Plan decreased from six districts to five. In

arriving at its conclusion, the majority totally ignores the mathematics. If each assembly district is required to have an equal number of persons, which it is not,[8] presumptively there should be 21,769 persons in each district.[9] Hartford has a population of 139,739 residents. A strict application of the town integrity rule mandates that it would be entitled to six seats wholly within its town lines—that is, 139,739 persons divided by 21,769 persons; and, therefore, it should only be required to share the remaining 9125 residents with other districts.[10]

Second, the spanning of the 29th assembly district across the borders of three towns, Hartford, Wethersfield and Rocky Hill, appears to be particularly egregious. The 1991 Plan requires a small number of Hartford residents to share one assembly district with 16,554 residents of Rocky Hill, the total population of that town, along with an indeterminate number of residents from Wethersfield.[11]

Third, sixty-five of 151 assembly districts (43 percent) cross town lines under the 1991 Plan. It is difficult to believe that this great number is required. Moreover, this number has substantially increased over the years; in 1971 there were forty-seven districts crossing town lines and in 1981 there were fifty-four such districts. From 1971 to 1991, there was an increase of almost 38 percent of assembly districts that crossed town lines.

---

[8] See pp. 196–97 of this dissent.

[9] One hundred fifty-one assembly districts have been established by law and the 1990 census for Connecticut is 3,287,116 persons.

[10] Furthermore, if the commission had drawn a plan of reapportionment with less than a 9 percent deviation from the mean of 21,769 for each assembly district, Hartford would presumptively have been able to have seven assembly districts wholly within its town limits. (Each of the seven districts would have 19,963 persons, a deviation of 1806 from the mean of 21,769 or 8.3 percent.)

[11] It is impossible to glean from the record the exact composition of the 29th assembly district because the 1991 Plan does not specify whether some 1933 persons in that district are residents of either Hartford or Wethersfield.

Fourth, the commission was motivated to create minority influence districts notwithstanding the complete lack of evidence to indicate that such districts were necessary under the federal Voting Rights Act, 42 U.S.C. § 1973 et seq. The minutes following the November 29, 1991 meeting of the commission are illuminating. "Senator [John B.] Larson called the meeting to order . . . and asked Representative [Robert F.] Frankel to describe the proposed Plan for [the] House of Representative[s] districts," which was in fact the 1991 Plan accepted at that meeting by the commission. Reapportionment Commission, November 29, 1991 Minutes (Minutes). It is obvious from the minutes that at the meeting Representative Frankel was not only the presenter of the plan but the one who justified it to the commission. "Representative Frankel described the House Plan as follows: The number one objective of the redistricting plan for the Connecticut House of Representatives was to ensure that all citizens of Connecticut will have an equal opportunity to participate in the political process and to elect representatives of their choice. The redistricting plan strictly adheres to the federal constitutional requirement of 'one person, one vote' *and the federal Voting Rights Act.* The State of Connecticut experienced a significant increase in minority population during the 1980s and we sought to [e]nsure that this increase would be reflected in representation in the State House." (Emphasis added.) Minutes, supra.

Any doubt about the commission's motivation is put to rest by Representative Frankel's statement that "[w]e understood that the Federal Courts have not required 'influence districts' but believe it is in the best interests of the minority community of Connecticut to develop a plan that would maximize the ability of the minority community to elect candidates of their choice." Minutes, supra. Representative Frankel

stated, for example, that in the Hartford area, the 1991 Plan maintains two influence districts while creating two new "effective minority" districts, that in the New Haven area, the 1991 Plan maintains the three existing minority districts, that in the Bridgeport area, the 1991 Plan creates two new Latino majority districts, preserves the black majority district and "result[s] in significant minority influence in four additional districts," and that in the Stamford area, the 1991 Plan creates one new black majority district and maintains "three significant minority influence districts." Minutes, supra. The *only* justification Representative Frankel gave for each such assembly district was minority representation, without once referring to the town integrity principle. As the triers of fact, under our original jurisdiction, we must draw a reasonable inference that the commissioner's primary concern was placating minority concerns and that, in doing so, the town integrity principle was left by the wayside.

Surely, minority influence districts, whether or not the federal Voting Rights Act mandates them, are matters that the drafters of the reapportionment plan should take into consideration. There must be fair representation for all ethnic and racial groups in our legislature. To draw lines in a manner that would result in underinclusion (failure to create minority impact districts) or overinclusion (minority packing) may very well implicate violations of other state constitutional provisions. Those considerations, however, cannot obliterate the state constitutional requirement of the town integrity principle. Rather, there must be a harmonization of conflicting constitutional principles; *Logan* v. *O'Neill,* supra, 726; if, in fact, there is a conflict.

Unable to extricate itself from the plain language of the minutes, the majority resort to our zoning laws to search "the record for evidence to sustain such decision making." This, however, just doesn't fly. First,

the record the majority searches is not the commission's record, but that of the legislative committee. Second, we have long held that once a commission states on the record the reason for its action, the decision must stand or fall on the basis of the reason articulated.[12] *Goldberg* v. *Zoning Commission,* 173 Conn. 23, 25–26, 376 A.2d 385 (1977).

[12] I am aware that this court has, without justification, departed from the long established rule that we will confine our review to the reasons articulated by the zoning board. *Gagnon* v. *Inland Wetlands & Watercourses Commission,* 213 Conn. 604, 609–10, 569 A.2d 1094 (1990); *Stankiewicz* v. *Zoning Board of Appeals,* 211 Conn. 76, 77–78, 556 A.2d 1024 (1989) (per curiam). In *Stankiewicz,* upon which *Gagnon* is based, the certified issue before this court was: "Did the Appellate Court err in concluding that if a zoning board gives *inadequate* reasons for granting a variance, as opposed to giving no reasons whatever, the trial court may search the record to determine whether basis exists for the action taken?" (Emphasis in original.) *Stankiewicz* v. *Zoning Board of Appeals,* supra. Although this court, in a per curiam decision, adopted the rationale of the Appellate Court, each case upon which the Appellate Court relied for the proposition that the reviewing court may substitute a valid reason for an inadequate reason concerned only instances where the zoning authority gave *no reason* at all for its decision. *Stankiewicz* v. *Zoning Board of Appeals,* 15 Conn. App. 729, 732, 546 A.2d 919 (1988). Unfortunately, the Appellate Court, in *Stankiewicz,* was summarily affirmed without any consideration of *DeMaria* v. *Planning & Zoning Commission,* 159 Conn. 534, 271 A.2d 105 (1970). *DeMaria* properly and logically held, "where a zoning commission has formally stated the reasons for its decision the court should not go behind that official collective statement of the commission. It should not attempt to search out and speculate upon other reasons that might have influenced some or all of the members of the commission to reach the commission's final collective decision." Id., 541; *First Hartford Realty Corporation* v. *Planning & Zoning Commission,* 165 Conn. 533, 543, 338 A.2d 490 (1973). The reasoning behind *DeMaria* is persuasive. When an administrative agency specifically states its reasons, the court should go no further because it could reasonably be inferred that this was the extent of its findings. To go beyond those stated reasons invades the factfinding mission of the agency by allowing the court to cull out reasons that the agency may not have found to be credible or proven. On the other hand, when no reasons are given for its decision, there is some justification for the court to search the record because it could reasonably be inferred that if the reasons were stated, they would have been those that could reasonably be found in support of the agency's decision. Therefore, this court's holdings in *Stankiewicz* and *Gagnon* that the inadequate reasons of the zoning board could be ignored and replaced with valid reasons have no foundation in any precedent.

The majority attempts to justify in part II C of the opinion its position of staying clear of disputes on reapportionment, not only because of "concerns about entering the 'political thicket,' " but also because of "the inherent unsuitability of such disputes to the ordinary and traditional principles of adjudication." This argument has no foundation under Connecticut constitutional jurisprudence and relies only on federal case law and commentators who make references to the federal constitution. These comments of the majority only point to its confusion and failure to understand the case that is before us today. We must decide matters that the constitution specifically mandates that we decide. Our state constitution *directs* that we assume "original jurisdiction . . . to be exercised on the petition of any registered voter . . . ." If it is a political thicket, then we must enter it at the direction of the constitution of the state of Connecticut; we cannot abrogate our responsibilities.

Finally, the majority delves into the very political thicket it cautions that we avoid. The majority attempts to justify its decision by stating that Hartford is better off today under the 1991 Plan than it has been for the last ten years because Hartford has a chance of controlling not six seats, as it did during the last ten years, but seven, as a result of the city's clear majority in the two assembly districts it shares with Bloomfield and Windsor. This political excursion the majority takes fails, of course, to consider the different political, economic or social demographics of those towns as compared with those sections of Hartford which the districts share.

The importance of ensuring that cities such as Hartford be fairly represented as a unit in the state legislature is fully documented by the Report of Hartford's Blue Ribbon Commission on Municipal Overburden (report) released in August, 1991. The report indicates

that of the twenty-nine towns included in the capital planning region, Hartford has by far the highest percentage of families living below the poverty level. This is underscored by comparing the number of families living under the poverty level in Hartford with such families living in the towns with which Hartford will share a legislator. In Hartford, 33.1 percent of the population lives under the poverty level as compared to 4.6 percent in Wethersfield, 3.8 percent in West Hartford, 3.2 percent in Windsor, 3.1 percent in Rocky Hill and 2.5 percent in Bloomfield. Furthermore, Hartford ranks last out of twenty-eight neighboring towns in per capita income, first in density per square mile, first in government assisted housing (30 percent more than the total of all of the other twenty-eight towns), and it has almost three times the school enrollment as its next closest municipality, West Hartford. Moreover, the amicus brief of the city of Hartford points out that approximately 67 percent of all overcrowded housing units in the thirty-seven towns comprising the Hartford Primary Statistical Area are located in Hartford.[13] Of these thirty-seven towns, Hartford is home to approximately 50 percent of the households in which a female is solely responsible for the care and welfare of related children. Lastly, the report reveals that Hartford's tax rate is staggering and has economically crippled the city; it also bears the highest unemployment rate in the region, the highest infant mortality rate and "[h]unger is a major concern in Hartford, especially among low-income families with children under 12 [who] attend public schools." The statistics of this distressed city demonstrate all too well the importance

---

[13] In its amicus brief, the city of Hartford relies on the 1990 Census Data Release prepared by its department of planning for these statistics. The 1990 Census Data Release states that "[u]sing a standard of 1.01 persons per room to indicate an overcrowded housing unit, 66.6% of all overcrowded units are located in Hartford. This is a total of 4735 units, 4266 of which are rental units."

of having a representative who owes her or his allegiance to one city or town. That is the raison d'etre of the town integrity principle.

Relying on the report, Hartford's amicus brief correctly notes that "if [Hartford] is to successfully combat its myriad problems, the state through its legislature will have to undertake a number of major initiatives." Notwithstanding the socioeconomic problems of Hartford, the majority puts its seal of approval on the plan that will place Hartford, with a per capita income of $9802, into assembly districts that will be shared with the affluent communities of West Hartford, with a $22,202 per capita income, Bloomfield, with a $18,314 per capita income, Wethersfield, with a $17,687 per capita income, Rocky Hill, with a $17,203 per capita income, and Windsor, with a $16,217 per capita income.

We must not lose sight of the importance of the town integrity principle. "Each of the political subdivisions sought to be protected by [the town integrity principle] has unique interests. . . . [C]ities . . . have statutory rights and duties different from the rights and duties of the smaller communities surrounding them; and . . . towns, wards and neighborhoods are comprised of ethnic groups with common interests in the economic, residential, recreational and educational betterment of their communities. The immediate consequences of the Commission's plan are clear: once political subdivisions have been split, there is little chance that the interests of their residents will be represented effectively so long as their elected representatives also represent other areas with different interests . . . ." *In re Reapportionment Plan for Pennsylvania General Assembly*, 497 Pa. 525, 546, 442 A.2d 661 (1981) (Larsen, J., dissenting.).[14]

---

[14] Of course, on the basis of the record that is before us, I am unable to say with absolute certainty that another reapportionment plan would do

Not only does Hartford lose today, but so do all of the citizens of Connecticut. The majority fails to give credence to our state constitution and, therefore, our federal form of government. Without any justification, the majority gives perfunctory approval to a plan, adopted by a nine member commission and not by the legislature, that patently violates an important constitutional provision—the town integrity principle. What was said in *In re Reapportionment Plan for Pennsylvania General Assembly,* supra, 549 (Kauffman, J., dissenting), is also true here: "Unless the Commission is required to give some explanation of the *absolute necessity* for each challenged split of a political subdivision, no appeal could ever possibly succeed, and the Commission would be given a virtually unlimited license to read out of the Constitution the express and legitimate prohibition against dividing political subdivisions unless *absolutely necessary* to do so. The majority's willingness to approve the Final Plan more or less on blind faith thus effectively deprives appellants of their express constitutional right of appeal." (Emphasis in original.)

I would order that the matter be remanded to the reapportionment commission to articulate in writing the reasons it had not complied with the state constitutional provision requiring that assembly districts be formed "wholly within the town." If, during the process of review, the commission concludes that the assembly districts can be redrawn to satisfy the state constitution more adequately, but that some town lines are still violated, I would then order that the commission revise the redistricting plan accordingly, and sub-

less violence to the town integrity rule. It may be, but I have doubts, that changing Hartford's assembly district line would cause a ripple effect requiring a greater percentage of assembly districts to be located in more than one town. The majority, however, speculates that a ripple effect would be created without a scintilla of evidence before it.

mit the revised plan to this court together with a written report setting forth the reasons it was unable to comply fully with the town integrity principle. Accordingly, I dissent.